J. L. CARROLL and Texas Employers' Insurance Association, Intervenor,

v.

MAGNOLIA PETROLEUM COMPANY and Sill & Hall.

No. 15274.

United States Court of Appeals Fifth Circuit.

June 21, 1955.

Petitions for Rehearing Denied July 20, 1955.

658

John J. Watts, Odessa, Tex., Gerald Fitz-Gerald, Midland, Tex., for appellant.

Royal H. Brin, Jr., Dallas, Tex., for appellee, Sill & Hall. Strasburger, Price, Kelton, Miller & Martin, Dallas, Tex., of counsel.

James T. Smith, Raymond A. Lynch, William L. Kerr, Midland, Tex., for appellee, Magnolia Petroleum Co., Turpin, Kerr & Smith, Midland, Tex., of counsel.

Before RIVES, Circuit Judge, and DAWKINS and DeVANE, District Judges.

DAWKINS, District Judge.

Magnolia Petroleum Company (herein called Magnolia) was the owner of a mineral lease on certain lands in Upton County, Texas, and desired to drill a well thereon. It contracted with Black Drilling Company for the drilling of the well and turned over the location, which was simply open, flat land. The drilling company in turn contracted with Sill & Hall, a rig-building partnership, for construction of the derrick; but the drilling company furnished a disassembled metal derrick which it had on hand. Sill & Hall completed its work of erecting the derrick on or about February 6, 1951, and the drilling company rigged the derrick and began drilling operations.

On February 13, following, appellant, who had only a few weeks' experience as a driller, was so employed on the well. About six o'clock in the morning, drilling at about 1300 feet, he pulled up to make a connection. The pipe stuck to some extent, and appellant "reamed" the hole from three to five times and then pulled up again. According to his testimony, he let out the clutch and reached for the brake and the derrick collapsed. It fell almost directly south, and appellant was pinned underneath and rather severely injured. He brought this suit against Magnolia and Sill & Hall, alleging that he was the invitee of Magnolia. He charged Sill & Hall with negligence in leaving out many essential bolts in the substructure of the derrick and in failing

to use jacks on the "re-legs", thereby leaving three of the re-legs in such a position that they did not touch or support the "water table". He alleged that the derrick collapsed because of its defective erection when only 80,000 pounds of pressure was being exerted. He charged Magnolia with negligence in failing to provide him a safe place at which to work.

Magnolia's answer alleged that it had delivered the premises to a competent independent contractor and had no connection with or control over either the erection of the derrick or the drilling operation. It denied the allegations of negligence and pleaded assumption of the risk, contributory negligence and unavoidable accident. Sill & Hall denied the allegations of the complaint charging it with negligence, alleging that it had erected the derrick properly and had no notice or complaints of any defects, and also pleaded assumption of the risk and contributory negligence. Both Magnolia and Sill & Hall alleged that they had delivered the premises to the independent drilling contractor and that they were not responsible for dangerous conditions or negligent acts which occurred thereafter.

A jury trial resulted in a verdict for both defendants. The motion for new trial was denied, and judgment was entered on the verdict. In his appeal from that judgment appellant raises 24 alleged errors; but those seriously urged may be condensed and summarized as follows: (1) error to reject opinion evidence offered by appellant relating to the cause of the accident and to admit such testimony when offered by appellees; (2) to permit questions by counsel for appellees concerning the custom of the oil field with respect to the responsibility for a derrick; (3) to exclude evidence that the tool pusher had reported the condition of the derrick to a truck driver thought to be employed by Sill & Hall; (4) to submit a charge on "unavoidable accident" when there was no evidence upon which it could be based; (5) to submit a charge relating to the open and obvious condition of the derrick and appellant's knowledge thereof; (6) to submit a charge on contributory negligence without evidence to substantiate it; and (7) to instruct the jury as to the responsibility of appellee for transitory conditions without evidence indicating the existence of such conditions.

In order to present the issues in their proper perspective it is necessary to relate the evidence in some detail. Only two of the witnesses who testified were present when the accident occurred. Appellant was one of these, and he recalled step by step his procedure when trying to loosen the pipe and prepare for the connection. He said that in pulling up for the connection, he discovered the pipe was "tight". He then "put a little strain on it and run my pump and tried to clean the hole out". At this time, he said, the indicator showed 72,000 pounds pressure on the rig, and the derrick fell. He stated that at the time he did not know of any defects in the derrick, since his job did not require him to inspect it, but he later learned three of the four re-legs were not supporting the water table and many bolts were missing from the substructure. Under cross examination he admitted that he was what is known as a "bronc" or inexperienced driller, but he denied that he was working his pipe too fast or that the block was swinging. He did, however, admit that his low clutch was "peculiar" and would occasionally slip, but denied it was burned out. He also admitted there was a north wind at the time, estimating it at 20 to 25 miles per hour, and that the broad or flat side of the block faced north.

Hildebrand was one of the workers who was present at the time of the accident. Testifying for appellant, he stated that he was standing near appellant and looking at the indicator just before the derrick collapsed. In describing the instant before the accident, he stated that he noticed smoke near the pump clutch and called this to appellant's attention. Then, according to his testimony, appellant "kicked his pump out and he picked up on the pipe just a little bit, I would

say up to eighty thousand." He swore that the "blocks and the rig was perfectly still" when the derrick fell.

Two workers who helped in rigging the derrick after its erection testified for appellant. They both swore that while "landing a crown" on the water table, they observed that three of the re-legs were not touching the water table and they reported this condition to the daylight driller, Northcut. One of these witnesses, Stringer, described his job as "working derricks". He testified that he had discovered many bolts missing in the substructure and had also found sub-legs which were not touching the foundation.

Johnson, the tool pusher on the well, also testified for appellant and said that Northcut had reported the condition of the derrick two or three days after it was rigged. He thought this condition was improper and weakened the derrick, but he did not stop the job because he didn't think there would be serious danger until the drilling reached a greater depth. He knew appellant was inexperienced and had been "run off" one job by Black Drilling Company, but he thought him competent to handle this rig.

There was evidence for appellant to the effect that the derrick used, when properly erected, had a weight capacity of 437,000 pounds and would withstand winds up to 54 miles per hour. Further, there was testimony that if three re-legs were not supporting the water table, the great part of the weight would be placed upon the fourth leg (here the southwest leg), a condition which would substantially reduce the weight capacity of the derrick. Several witnesses stated that the absence of essential bolts in the substructure would materially weaken the derrick.

None of appellees' witnesses were present when the accident occurred. Among them, however, were men who had worked for Sill & Hall in erecting the derrick, and they testified positively that jacks were placed under all four re-legs and that when they left the der-rick, all re-legs were supporting the water table. They also swore that they put all bolts in the substructure, and one testified that the derrick used here had holes in the substructure apparently made for bolts but actually placed there for other purposes. This witness stated that a person not familiar with rig building might see such holes and erroneously conclude that bolts were negligently omitted.

Both Sill and Hall testified, as did an engineer familiar with the proper erection of derricks. All three testified that re-legs were merely supplementary to the regular legs of a derrick, and were attached to the legs and jacked into contact with the water table. They stated that re-legs are added to give greater weight capacity for deep drilling and that the derrick in this case could have supported the drilling rig to the entire anticipated depth of 8,000 feet without re-legs. They were of the opinion that any failure of the re-legs to support the water table would have no effect upon the capacity of the derrick for skillful use at 1300 feet and expressed the view that if a derrick collapsed because of unequal weight on one leg it would fall in the direction of that leg (southwest here, rather than due south). They said any derrick could be "pulled in" if the driller worked his pipe too fast or applied heavy pressure while the block was swinging excessively. They did, however, admit that the absence of essential bolts in the substructure would weaken the derrick.

All of appellees' witnesses who were questioned on the point denied that they had ever received any notification from anyone that the derrick was defective or improperly erected. It was shown that Black Drilling Company had paid for the erection of the derrick without question.

The above summary of the evidentiary facts furnishes the background for considering the first specification of error listed. During the course of the trial, counsel for all parties repeatedly sought

to elicit from witnesses their opinions as to what caused the derrick to collapse, and we quote some of these attempts in the margin to illustrate the questions asked, the objections entered and the rulings made.[1] Appellant's "experts"

1. *For appellant:*
Witness Hildebrand, being questioned by counsel for appellant:
"Q. Now, we have proved that this rig had a weight capacity of 437,000 pounds. Do you know of anything that Mr. Carroll did, had it not have been for the defective condition of the derrick legs, that could possibly have pulled in a rig at eighty thousand pounds on that occasion that is supposed to withstand a pressure—
"Mr. Smith:
Your Honor—
"Mr. Watts:
I haven't even completed my question.
"Mr. Smith:
Note our exception.
"Mr. Strasburger:
We object to that as being leading, suggestive, and argumentative.
"The Court:
That objection is overruled.
"Mr. Strasburger:
And no proper predicate laid. He is not shown to be qualified as an expert witness that goes into stresses and strains and higher mathematics.
"The Court:
I think that last objection is good. The Court overrules the first objection and sustains the last objection."

\* \* \* \* \*

"Q. Did you see anything that the driller did that could cause a rig that is supposed to have a capacity of 437,000 pounds to collapse on 80,000 pounds?
"Mr. Strasburger:
We renew our same objection.
"Mr. Smith:
We rejoin in the objection."

\* \* \* \* \*

"The Court:
The Court will permit him to testify to anything he saw, not to speculate. The objection is sustained."
Witness Johnson:
"Q. We have introduced evidence that this was a 129 Emsco derrick that was supposed to have a load capacity of 437,-000 pounds, and a wind capacity of seventy miles an hour. In your twenty-seven years of experience in the oil field, was the wind very strong that morning? A. Well, it was a little out of the ordinary but it wasn't very strong, about twenty to twenty-five miles per hour.
"Q. It wasn't very near seventy? A. No, sir.
"Q. The wind didn't blow that down, did it? A. I don't think so.

"Mr. Smith:
I object to that. That calls for a conclusion.
"Mr. Strasburger:
We make the same objection.
"The Court:
Yes, I think it calls for a conclusion. Objection sustained.
"Mr. Smith:
We ask that the jury be instructed to disregard it.
"The Court:
The jury is instructed to disregard that.
"Q. Do you know anything that the driller did on this occasion that could possibly, from your twenty-seven years of experience, have caused this rig that is supposed to withstand 437,000 pounds of weight to collapse when eighty thousand pounds is put on it, assuming that no pipe was in motion and the crown blocks weren't moving, and the wind was only blowing twenty-five miles per hour?
"Mr. Strasburger:
We object to that as leading, suggestive, and invading the province of the jury.
"The Court:
Objection sustained."
Witness Laing:
"Q. Can you tell me how, with the blocks not moving, and with the pipe standing still and with an indication that there is only eighty thousand pounds upon the rig immediately prior to the time that it collapsed how that accident could happen except for defective construction?
"Mr. Strasburger:
Your Honor, that is invading the province of the jury.
"The Court:
Objection sustained."
*For appellees:*
Witness Hall, being questioned by counsel for Sill & Hall:
"Q. Now, from your experience of over twenty years in the oil field, and from what you yourself know what the condition at the scene of the accident was, and judging and hearing Mr. Carroll's testimony, what is your opinion as to what caused the derrick to pull over? A. In my opinion he whipped the derrick over.
"Q. How would he do that? A. His pipe was stuck and wouldn't move—
"Mr. Watts:
We want to make this further objection, Your Honor. We have the only two

were Johnson, the tool pusher, Hilde-brand, the derrick worker, and a rig builder, Laing. Appellees Sill and Hall both testified as experts, and they produced the testimony of Black, the owner of the drilling company, and Oates, who

witnesses that were there and you can't disprove positive testimony by hypothetical negative testimony of a witness that wasn't even there.

"The Court:

He can qualify as an expert, though, and he has testified as to his familiarity with the conditions prevailing there.

"Mr. Watts:

He wasn't there when it happened.

"The Court:

Not at that very instant it happened but he was there before and he says it was properly installed, and the Court is going to admit his testimony due to his experience and expertness.

"Mr. Watts:

Note our exception."

\* \* \* \* \*

"Q. Assume for the sake of argument that only one re-leg touched the water table and the others lacked four inches of touching. Will you please tell the jury whether or not that would have had anything to do with the accident in question? A. It wouldn't have had anything to do with it whatsoever.

"Q. Why? A. The derrick wasn't pulled over. It was whipped over.

"Q. Now, say that you have got only one of them that touches, the other three don't; the only difference it makes with one touching and the others not touching is that the one that touches is the strongest leg than the other ones? A. That is correct.

"Q. And any of them without a re-leg, whether they touch or don't touch, would carry more than 400,000—or more than eighty thousand pounds, wouldn't it? A. Yes, sir.

"Q. Is it the amount of weight that is put on the derrick that causes it to be pulled over, or is it something else? A. It is the way it is applied."

Witness Sill:

"Q. Now, Mr. Sill, you heard the testimony of the plaintiff, Mr. Carroll, as to what he was doing and just before and at the time of the accident, didn't you? A. Yes.

"Q. What is your opinion based on his testimony as to what caused the derrick to be pulled over?

"Mr. Watts:

We want the same objection as heretofore made. May we have the same objection?

"The Court:

Yes. Objection overruled. A. The traveling block whipped on him.

"Q. What made it whip? A. Pulling on it.

"Q. Was the wind a factor? A. The wind would help being a factor, yes.

"Q. Do you know of any other way that that derrick could have been pulled over due South except in the manner that you just described? A. None whatever. I have seen too many of them pulled over in my life."

Witness Oates:

"Q. Now then, could you tell from your observation out there, and from your experience in the oil field, what in your opinion caused this derrick to fall?

"Mr. Watts:

We object to that, Your Honor, as invading the province of the jury, and he is not qualified. He wasn't present.

"The Court:

In view of previous testimony the objection is overruled.

"Mr. Watts:

Exception.

"Q. Go ahead, Mr. Oates? A. I think the boy pulled up too high to make a connection. He was a young man on the job; in fact, the first well, and more than likely the second tour he had ever drilled; and he pulled up a little bit too high, maybe had a little trouble pulling it up; and he was going to try to free it up before he makes this connection because he would have to rotate it out and it won't rotate unless it is free. Well, evidently he tried to get the pipe back where he could set his slips to make this connection, and when these blocks come down by the swivel and kelly, because the blocks would go one way and the top of this kelly will go the other, and the wind was blowing on this derrick, so it just laid over. That is all I can say."

Witness Black:

"Q. Now then, from your observations out there, and from your experience in the oil fields, do you or could you form an opinion as to what caused this derrick to fall over?

"Mr. Watts:

Your Honor, I presume that I may have the same objection?

"The Court:

Yes, same ruling, same exception.

"Q. Did you form an opinion, Mr. Black? A. Yeah.

"Q. Would you tell the jury what your opinion was as to what caused this derrick to fall? A. Well, they were only thirteen hundred feet with this well, and this driller evidently had pulled up to

was drilling superintendent for Black at the time of the accident.

 A properly qualified witness, whose training or experience, or both, has given him peculiar and reliable knowledge of the subject being explored, may give his opinion thereon to assist the trier of facts in handling specialized fields. However, it is always necessary to lay a proper foundation for such opinion evidence by correlating the testimony with the facts of the particular case being tried. If the expert has no knowledge of these specific facts, the "hypothetical question" may be used. Even then, care must be exercised to assure that the facts contained in the hypothetical question are supported by competent evidence in the record. It must always be remembered that the jury is sitting to hear and decide the *facts*, and in a case like this one, to determine the real *cause* of the accident. There is ever present danger that an expert witness may invade, indeed, usurp the jury's province by giving an opinion upon the ultimate issue to be decided; and only meticulous supervision by the trial judge can avoid such consequences.

 Applying these general remarks to the present case, we think it was entirely proper to allow experienced drillers and rig builders to explain in general terms the proper procedures for operating a drilling rig and for constructing an oil derrick, since it was certainly necessary for the jury to know something about these subjects in order to decide the case. However, we believe the record, as illustrated by the colloquy quoted in the footnote, clearly reveals that counsel for all parties and the trial court failed to bear in mind the true purpose and scope of expert testimony. Only one of the witnesses from whom such testimony was elicited was present when the accident occurred, and the

judge quite properly refused to allow him to state whether he saw appellant do anything which in his opinion was a cause of the accident. Yet, Johnson was allowed to speculate as to the cause, and appellees' witnesses not only stated their opinions as to the cause but actually testified in detail what they thought appellant did to bring about the collapse of the derrick. Appellees' whole defense was predicated upon and built up around their expert testimony as to the cause, and their witnesses repeatedly referred to the velocity of the wind and the excessive swinging of the crown block in stating their opinions, although the only two witnesses on the scene swore the block was not swinging. A mere reading of their testimony illustrates clear examples of experts invading the province of the jury, and the error was compounded when they were allowed to assume facts not proven.

 While it is true that counsel for appellant was perhaps as much responsible for erroneous use of expert testimony as was counsel for appellees, and even though the record might otherwise support a finding that there was no negligence in the erection of the derrick, we are of the opinion that the errors revealed here were of such seriousness and bore so directly upon the fundamental issues of the case that reversal is required. So far as we know, the jury might have found for the appellees because it believed the testimony of their witnesses as to the cause and therefore thought appellant guilty of contributory negligence. We cannot allow such a speculative verdict, possibly based upon inadmissible evidence, to stand, even when there is other evidence upon which the verdict might have been based. We also note in passing that there was no instruction to the jury, and apparently none was requested, whereby the jurors

make connection. He had got the kelly up past the rotary, and so he got the drill pipe hung, stuck, couldn't move it, and he just pulled and worked, til he got the block swinging way up at the top of the derrick with a high wind blowing, and I think he just slacked way off, and then he pulled some more, and when the block got to swinging the wind caught it and just turned the derrick over."

were informed that they could appraise the credibility and weight of expert testimony in the same manner as any other evidence in the case. We are therefore convinced that appellant was prejudiced when the jurors took into their deliberation the testimony of at least four witnesses, who were not present at the time, that appellant had carelessly pulled the derrick in.

The second specification of error arose when, several times during the course of the trial, counsel for appellees sought to establish a prevailing custom in the oil fields to the effect that the acceptance of a derrick by the drilling contractor relieved the rig-builder from any further responsibility for its condition. The trial judge excluded such testimony on some occasions but admitted it on others. While the situation may not arise upon retrial, we deem it necessary to express our view that all such evidence should be excluded. We know of no rule, and have been cited to none, which allows an informal custom to prevail over positive principles of law, and appellees could not escape liability for any negligence which was the proximate cause of appellant's injuries merely because such custom existed. Moreover, testimony by appellees' witnesses shows that the alleged custom was nothing more than an informal understanding that the rig-builder is not obligated to return to the location and make repairs to the derrick unless the drilling contractor calls defects to his attention before paying for his services. This has nothing to do with a rig-builder's liability in tort for the negligent erection of a derrick.

As to the third specification of error, we are convinced that the trial court was correct in excluding testimony by which appellant sought to show notice to Sill & Hall. The tool pusher, Johnson, was asked if he reported the alleged defects in the derrick to Sill & Hall. His testimony that he told one of their truck drivers was excluded. Later, out of the presence of the jury, appellant was allowed to go into the alleged agency of the truck driver, who Johnson said was picking up some scaffold boards left at the location when the rig-builders finished. However, there was no evidence that the scaffold boards or the truck belonged to Sill & Hall or that the driver was employed by them. In fact, Johnson did not even know the driver's name. We think it clear that no proper predicate was laid for such testimony, even if it were assumed that notice to their truck driver would be notice to appellees, Sill & Hall; and, of course, such evidence would not be admissible against Magnolia in any event. The authorities cited by appellant [2] do not deal with comparable situations.

The other specifications relate to portions of the charge, but there is no complaint about the wording thereof. The only contention is that there is no evidence in the record to substantiate any of the defensive theories thereby submitted to the jury. Since the case must be tried again, it would be meaningless to discuss these charges in relation to the evidence contained in this record; but for the guidance of the trial court, we observe that there must be evidence to support any theory submitted to the jury. Defense counsel may not raise an issue of fact merely by arguing a theory or by asking questions so phrased as to give rise to inferences not supported by the evidence.

What we have said is applicable only as between appellant and Sill & Hall, who erected the derrick, for we are convinced that the jury could not have returned a verdict against Magnolia. Appellant's own evidence shows that Magnolia turned a flat, level leasehold over to the drilling company as an independent contractor. There is no evidence that it had anything to do with the selection of the rig-builder, with the erection of the derrick or with the operation of the drilling rig, or that it had

---

2. Liberty Mutual Insurance Co. v. Boggs, Tex.Civ.App., 66 S.W.2d 787; Harper v. Highway Motor Freight Lines, Tex.Civ. App., 89 S.W.2d 448.

any knowledge of alleged defects in the derrick. The errors discussed above arose between appellant and the rig-builders and the evidence complained of did not involve Magnolia. There could have been no prejudice to appellant's rights against Magnolia, for he never introduced any testimony to bring himself into a legal relationship with it so as to give rise to a claim in damages for its negligence, nor did he prove any facts to show negligence on its part. Thompson v. Rowan Drilling Co., 5 Cir., 197 F. 2d 32; Moss v. Safeway Stores, Inc., 5 Cir., 185 F.2d 966; Union Tank & Supply Co. v. Kelley, 5 Cir., 167 F.2d 811; Holt v. Texas-New Mexico Pipe Line Co., 5 Cir., 145 F.2d 862.

The judgment appealed from is affirmed as to Magnolia, but reversed as to Sill & Hall; and the matter is remanded with instructions to order a new trial of appellant's action against Sill & Hall.