Elizabeth STEINBERG, Appellant,

v.

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Appellee.

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Appellant,

v.

Elizabeth STEINBERG, Appellee.

No. 22625.

United States Court of Appeals Fifth Circuit.

July 27, 1966.

Rehearing Denied Aug. 1, 1966.

See also D.C., 36 F.R.D. 253.

Gerald P. Fedoroff, Cecil M. Burglass, New Orleans, La., for appellant.

Carl J. Schumacher, Jr., Lemle & Kelleher, Dermot S. McGlinchey, New Orleans, La., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge:

This diversity action was brought against the malpractice insurer of certain plastic surgeons[1] asserting negligence in their postoperative treatment of plaintiff with resulting personal injuries, disfigurement, etc. A jury returned a verdict in favor of plaintiff in the sum of $49,000; judgment was en-

tered June 15, 1964. Defendant filed a timely motion for judgment n. o. v., and alternatively, for a new trial, on the ground that the evidence was insufficient to support the verdict. On July 8, 1964, some 23 days after the entry of judgment, the district court denied defendant's motion for judgment n. o. v., but ordered plaintiff to enter a remittitur of $20,400, so as to reduce the award to $28,600, or a new trial would be granted.

Thereafter plaintiff sought by motion to vacate the conditional order of remittitur on the ground that defendant's motion for new trial did not specify excessive quantum as a ground therefor; and that under Fed.R.Civ.P. 59(d), the court lacked judicial authority to grant a new trial on its own initiative except within 10 days after entry of judgment. The district court in a written opinion, 36 F.R.D. 253, denied plaintiff's motion. After this court refused to entertain an appeal from the district court's interlocutory order, plaintiff consented to entering the remittitur, but only under protest, and has steadfastly refused to accept the fruits of her judgment, relying on Delta Engineering Corp. v. Scott, 322 F.2d 11, 15 (5 Cir. 1963), cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964).

Consequently, plaintiff perfected this appeal, placing at issue the propriety of the district court's conditional order of remittitur. Defendant filed a cross-appeal, based upon the district court's refusal either to direct a verdict for it at the close of plaintiff's evidence or enter judgment n. o. v. We have concluded that the district court abused its discretion in ordering the remittitur described, but that the judgment was correct in all other respects. Accordingly, we affirm in part, but reverse the order of remittitur and remand with directions to reinstate judgment in the full amount of the verdict.

Examination of the facts in some detail is necessary. Plaintiff was burned

[1]. Louisiana's Direct Action Statute, LSA-R.S. 22:655, allows an action to be maintained directly against the alleged tortfeasors' professional liability insurer.

as a child and grew to adulthood with scars on the anterior aspects of both thighs. For purely cosmetic reasons, the scars causing no impairment to any bodily function, she decided upon plastic surgery for their removal. On September 7, 1960, the insured doctors, operating in two teams—one on each leg since time is of the essence in plastic surgery—excised the scar tissue, removed healthy skin from a donor site on plaintiff's abdomen, and applied skin grafts to the recipient sites.

Plaintiff does not complain of the plastic surgery itself. Rather, her claims of negligence relate to the postoperative care accorded her, which consisted of bandaging and splinting the legs so as to immobilize them and facilitate success of the skin grafts. This procedure included the tying of a dressing to the site of the graft, application of surgical rayon stockings covering the upper legs, and placing of the legs in plaster splints or half-casts, extending from the top of the thighs to the feet, with the anterior portions of both legs exposed. This requires use of a padding called sheet wadding between the immobilized legs and the splints.

Upon return to her hospital room following the operation plaintiff complained of pain in the *posterior* portions of her legs, predominantly on the left. One of the doctors adjusted the bandage on her left ankle, and administered medication, but the plaintiff's relief was brief. She continued to suffer from burning pain originating in the back of her legs, areas not involved in the plastic surgery.

On the second day following the operation, with recurrent pain persisting, the dressing was again loosened, and a blister formation was seen on the back of the patient's left leg about four inches above the heel. It is undisputed that at this time the doctors definitely knew what was happening to plaintiff's legs. Pressure caused by the weight of the legs against the splints was cutting off blood circulation to the skin on the posterior of her legs. Blistering is the first objective sign, with burning pain as the subjective symptom, of necrosis, or dying of the skin from lack of circulation. Neither is it disputed that, although plaintiff continued to complain bitterly of burning pain in an area not involved in the surgery, it was not until the fourth postoperative day that her legs were removed from the half-casts. Then it was seen that she had sustained severe necrosis of the posterior portions of her legs, with blistering and dead skin on the left extending from mid-thigh to ankle.

Because of complications caused by necrosis, plaintiff's recovery was prolonged and most painful, although the skin grafts to her thighs were successful. Two additional operations were required involving another graft, in which skin was removed from her buttocks and grafted to the posterior aspect of her left knee. Even though the second skin graft was successful, she has lost some of the function of her left knee because of the necrotic condition. Moreover, this graft has caused disfigurement, visible even when she is wearing street clothes.

■ By her appeal plaintiff seeks to set aside the order of remittitur and reinstate the verdict awarding her $49,000. In Delta Engineering Corp. v. Scott, supra, we assumed without deciding that until such time as a plaintiff actually has obtained the fruits of a judgment he or she is free to challenge the legal correctness of the Court-enforced remittitur. In the case here presented we are faced with that issue squarely, and we hold that plaintiff here, who was refused an appeal on the interlocutory order of remittitur and who has consented to entry of the reduced judgment only conditionally, as a means to facilitate this appeal, has suffered a sufficiently adverse adjudication to allow an appeal.[2] Moreover plaintiff has not collected the judgment as reduced.

---

2. On the reviewability of the order of a district court to enforce a remittitur see generally 6 Moore's Federal Practice ¶ 59.08[6], notes 60–72 and accompany-ing text. See also cases cited in Delta Engineering Corp. v. Scott, 322 F.2d 11, 16 (5 Cir. 1963), at note 5.

The record reveals the following pertinent facts with respect to the damages plaintiff suffered. It should be noted at the outset that plaintiff was led to believe that the plastic surgery would hospitalize her for about two weeks and cause some pain and discomfort during that period and afterward while the skin graft and donor areas healed. But, as the result of the complications described, she was hospitalized initially for some 32 days. During the four-day period that necrosis developed plaintiff experienced the acute burning type pain associated with pressure necrosis. She testified that the pain from the graft area was minimal. When the splints were finally removed, to view the posterior of her legs, plaintiff was subjected to a most painful clean-up procedure, in removing dead skin and cleansing the injured portions of her legs. When the legs were redressed no splints were applied.

At the end of the first period of hospitalization plaintiff was able to walk only with the assistance of crutches. When there was sufficient healing she was re-admitted for a two-week hospitalization during which plastic surgery was performed to replace the skin on the posterior aspect of the left leg. When this was terminated plaintiff continued to use crutches. A few months later a third operation was performed to correct the second graft to the knee joint, which cause a tightening of the joint from the new skin. Another graft was needed to relieve this tension on the leg so it could straighten itself. On the issue of liability it is significant that following this third episode of plastic surgery splints were again applied. When, a few hours after surgery, plaintiff began to complain of a burning pain like the previous one, the splints were removed and she was merely admonished to keep the leg elevated and immobile.

She again used crutches to walk following the third skin graft and continues to experience a significant loss of function in her left leg. In all she was hospitalized for about eight weeks in the period from September, 1960 through February, 1961, during which she suffered greatly.

Prior to surgery plaintiff had worked as a dental assistant and as a waitress, both requiring a substantial amount of standing and walking. She was quite athletically inclined and enjoyed sport parachuting or sky-diving. Since the initial operation she has been unable to resume either her former occupations or her athletic activities because of significant loss of function in the left knee joint. Standing or walking for extended periods is overly fatiguing. On one occasion she sought employment with a local telephone company but was rejected because of her physical disability.

Visually, serious permanent scarring is present on the back of plaintiff's lower legs, particularly the posterior of the left knee, which cannot be satisfactorily hidden. Upon this set of facts, essentially undisputed by defendant, who appears concerned primarily with the liability issue rather than quantum, we are of the opinion that the verdict awarding plaintiff $49,000 had ample support in the record. There has been no showing that the jury's verdict resulted from prejudice or misconduct, and we feel that the factfinders' conclusions on quantum, amply supported by the record, must stand. Consequently, we regard the trial court's grant of a new trial, on condition of remittitur, to be an abuse of discretion.[3]

3. In Neese v. Southern Ry., 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955), rev'g 216 F.2d 772 (4 Cir. 1954), a jury verdict was returned in an FELA case in the amount of $60,000. The trial court felt the award was excessive and ordered a new trial unless $10,000 be remitted. Remittitur was duly made and judgment entered for $50,000. The Court of Appeals reversed, finding the amount without support in the record and ordered a new trial on quantum alone. On certiorari, the Supreme Court reversed and reinstated the judgment of the district court, finding that the amount was not without support in the record.

Cf. Delta Engineering Corp. v. Scott, 322 F.2d 11 (5 Cir. 1963), cert. denied

In light of this disposition it is unnecessary to consider plaintiff's contention that the district court lacked judicial power, under Rule 59(d), to order a new trial more than 10 days after entry of judgment on a ground not asserted by defendant in its motion. Controversy over this point has now been resolved by the amendment to Rule 59(d) effective on July 1, 1966. (For a discussion of the problem prior to its resolution, see th Advisory Committee's Note thereto.)

■ By its cross appeal defendant raises two interrelated issues for decision. First, it contends that the district court was in error when it allowed plaintiff's expert medical witness, a general practitioner, to testify concerning the alleged malpractice by the insured plastic surgeons. In effect defendant contends that the postoperative treatment, alleged to have been negligently performed, was so interwoven with the surgical operation itself, that the two must be treated as a single episode of an operation, which would be peculiarly within the knowledge of a specialist. Thus, it argues, the general practitioner plaintiff relied upon as an expert was not qualified to testify; and, without the testimony of a competent expert, plaintiff's case could not go to the jury.[4]

Defendant's assertion that the insured doctors, knowing full well that necrosis was beginning to develop, were called upon to exercise their professional judgment as to whether manipulation of plaintiff's legs to treat the complications would overly endanger the fresh skin graft, is best pointed out by Doctor Meade's response to a question put by the trial judge:

"BY THE COURT:

Q Doctor, when a patient or when Mrs. Steinberg complained of pain in the Achilles area, why did you not take off the dressing and take a look to see what it was?

A Well, the first thing, I knew what it was. I knew the only thing that it could be was pressure. That had this pain not been relieved by an adjustment of the dressing, I most certainly would have taken it off, but one has to weigh what is going to be accomplished by this. I don't think there is any question that if I knew what happened was going to happen that I would have taken it completely off. There isn't any question in my mind about that, but I had to weigh in the balance whether it was better to try to allay this sympton that we were having, as far as pain in the heel was concerned, as against what removing this splint and the manipulation that would be involved would do as far as the operative site is concerned. Now, it is possible that this could be removed without any adverse effect upon the operative site, but on the the other hand, there could well have been sufficient motion to have considerably altered the course of the healing in the operative site. And one must make up his mind which is going to be the worse, and I knew that if we ran into difficulty as far as the operative site was concerned, we were going to have severe trouble.

Now, the trouble relating to this pain from a pressure point in the cast or pressure in a cast, can be serious or it can be minor; and it was a matter of judgment which I felt it was better to try to alleviate her symptoms by the lesser, the

377 U.S. 905, 84 S.Ct. 1164 (1964), (verdict returned in the amount of $98,200; remittitur reducing judgment to $75,000 upheld as within trial court's discretion); International Paper Co. v. Busby, 182 F.2d 790 (5 Cir. 1950) (verdict of $11,000 reduced by remittur to $5,000 upheld as within trial court's discretion).

4. In its discretion the trial court required plaintiff to introduce the testimony of at least one medical expert. Although research has not disclosed authority in Louisiana requiring such a rule, it appears to be the rule applied in most jurisdictions. See 7 Wigmore, Evidence § 2090 (3rd Ed. 1940); Annot. 81 A.L.R. 2d 597 (1962).

less drastic of the approaches to this problem.

If I had to do it over again, there is no question in my mind, that I would take the whole thing off; but it did not appear to be that serious a situation at the time that I saw her."

Defendant argues that its insureds were called upon to determine the consequences of such a procedure and act according to the prevailing standard of care for such a judgment, which lies only within the scope of knowledge of a plastic surgeon. Therefore, it is contended, since plaintiff produced no evidence that the insured doctors' acts fell below the standard of care required of *plastic surgeons*, there was no evidence upon which a jury could find malpractice.[5]

This argument misses its mark. Throughout the trial plaintiff's expert, a general practitioner, was candid about his lack of any knowledge of plastic surgery as a specialty. The burden of his testimony was that application of the splints, a mere mechanical act often performed by technicians, was not done with the care required by *ordinary* medical prudence. His opinion was based upon the type of injury sustained—necrosis with resulting loss of skin, caused by pressure of the legs against the splints—as to which there was no significant dispute between the parties, and upon the hospital record itself. The hospital record made no mention as to whether any padding or sheet wadding was used in the splints as pointed out by plaintiff's expert on direct examination:

"Q Dr. McIntire, do you have the record with you?

A Yes.

Q Or a copy of the record?

A I have a copy of the record.

Q What is the date of that report?

A This report is dated September 7, 1960, which was the date of the operation.

Q Would you read to the jury what Dr. Bonura stated was done in connection with the application of dressings and the plaster of Paris splint to the plaintiff, Mrs. Steinberg?

A Well, he first begins, and you can see that it is a long page, and at the beginning he goes through what—

Q Doctor, I refer you specifically not to the—I don't refer you to the operation itself, but what was done in connection with the dressing of the operative wound, and the application of the plaster of Paris splint?

A He says, 'These were followed by rayon gauze, and a circumferential wrap with kerlix by-laterally [*sic*]. Posterior long leg splints were applied and held in place with bias-cut stockingette.'

You can see that he mentioned nothing of any type of padding, like sheet wadding, or felt, which is usually used for padding, when you apply any type of splint or cast that is made of plaster of Paris.

At first I thought that maybe it was just an oversight, but then on the operation that he performed, or they performed on February 13th, 1961, we get down to the same place and in his progress notes, this is what he said: 'Subsequent dressing consisted of burn gauze rolled around the margins of the vollus followed by

---

5. In support of its position defendant cites a number of cases where physicians were disqualified to give expert testimony because of lack of "occupational experience" or knowledge with respect to the particular medical specialty in issue. Among them are: Huffman v. Lindquist, 37 Cal. 2d 465, 234 P.2d 34, 29 A.L.R.2d 485 (1951); Moore v. Belt, 34 Cal.2d 525, 212 P.2d 509 (1950); Sinz v. Owens, 33 Cal.2d 749, 205 P.2d 3, 8 A.L.R.2d 757 (1949); Peterson v. Carter, 182 F. Supp. 393 (W.D.Wis.1960). Even the most cursory examination of these cases reveals that the alleged malpractice was during the performance of a medical specialty, on the subject of which only another such specialist would be competent to testify. See note 7, infra, and accompany text.

several layers of kerlix over the entire leg, followed by sheet wadding,' which is the padding that we use in casts, and ' * * * a plaster splint was placed over this entirel yon the posterior aspect and held in place with a bias-cut bandage.'

Q And what was the date of that report?

A This was reported on February 13, 1961, and it is signed by the same Dr. Bonura.

Q Doctor, is your testimony to the effect that in the first report, that of September 7, 1960, there is a failure to mention any padding in connection with the application of the plaster of Paris splint?

A He mentioned no padding whatsoever.

Q And in the report of, what was it; October—

A February 13, 1961.

A [sic] In the report of February 13, 1961, was that an operation on this plaintiff?

A It was an operation with skin graft on this plaintiff.

Q And in that report he does mention padding, is that correct?

A He does."

Neither defendant's insureds nor its experts attempted to contradict the hospital record with reference to the use of padding in the splints, other than to say that placement of padding was a matter of routine which was not always noted in the record. Indeed, each of the doctors seemed to state that he could not recall specifically whether padding had been used. It is manifest that the jury was warranted in drawing the conclusion, as it necessarily did, that no padding had

been used and that such an omission was medical negligence. Fault of this type was provable without respect to the credentials of plaintiff's expert. Consequently defendant's objection to his relative expertise is misplaced.

█ The verdict, which of necessity implies a finding of negligence proximately causing the injuries, is also supported directly by Dr. McIntire's testimony concerning the prevailing standard of care in the New Orleans area with respect to the application of plaster-of-Paris splints, as to which he had had considerable training and experience:

"Q In summary, do you or do you not believe, Doctor, that these doctors could have successfully investigated the complaints of this patient, the complaints of burning pain, without disturbing the operation that was performed?

A They sure could.

Q Now, Doctor, do you believe that this failure to heed these complaints and to disturbing these bandages, constituted, or let's say, failed to meet the standard of care, and the skill and knowledge of the average doctor, be he general surgeon or plastic surgeon or general practitioner in the City of New Orleans?

A Yes, sir.

Q You believe that it did not meet that standard of care?

A It did not meet that standard of care that should have been given this woman.

Q It is beneath the standard of care?

A It was negligence. They made a mistake."

Defendant cites a number of cases [6] for the proposition that where the exercise

6. In addition to those cases cited in note 5, supra, Pearce v. Linde, 113 Cal.App. 2d 627, 248 P.2d 506 (1952); Huttner v. MacKay, 48 Wash.2d 378, 293 P.2d 766 (1956).

But cf. Agnew v. City of Los Angeles, 97 Cal.App.2d 557, 218 P.2d 66 (1950)

(in a malpractice case a specialist in pathology was held qualified to testify as to the cause of aseptic necrosis generally, and as to the cause with reference to plaintiff).

of a specialty such as plastic surgery is attacked as having been negligently performed, before the plaintiff can get his case to the jury he must introduce expert testimony from a physician who practices the same specialty. We believe the defendant is relying upon an overbroad application of the rule, which, as Wigmore suggests,[7] is concerned merely with the help the jury can receive from the expert. The inquiry then, is whether the proposed expert has actual knowledge of the particular procedure attacked as negligent. While in the bulk of the cases cited by the defendant the alleged malpractice was by a specialist in the performance of his specialty, it is perfectly clear on the record here that plaintiff's expert was more than adequately versed in the type of postoperative care here involved, albeit a follow-up phase of a surgical operation, consisting merely of application and use of splints, by which plaintiff's injuries were sustained.[8]

The second point raised by defendant is its contention that the district court committed error in allowing plaintiff's expert to state his opinion "as to the ultimate legal issue involved in the case":

"Q Now, from these sources of information, have you reached any conclusion as to whether there was or whether there was not malpractice committed by the Owens-Meade Clinic in the treatment of this plaintiff, Mrs. Steinberg, while she was under the care of the doctors over there?

MR. SCHUMACHER: To which question I object unless the witness is both medical and legal expert, and I think that that is the ultimate question that we have here for the jury.

THE COURT: That is the question that this witness was called on to testify here, and the objection is overruled. It is up to the jury ultimately to decide whether or not the basis for his conclusions deserve consideration or not.

\*      \*      \*      \*

A Yes, I have.

---

7. See generally, 7 Wigmore, Evidence § 1923 (3rd Ed. 1940).

8. In a discussion of capacity with respect to what special experience is necessary for testimony on medical matters, it is stated in 2 Wigmore, Evidence § 569 (3rd Ed. 1940) that.

"The chief question that here occurs is whether a *general practitioner* may testify on matters of a particular department of the science wherein specialists may presumably be had. Here the Courts seem not to have taken a sufficiently firm stand against the narrow objections frequently raised. It is not that the rulings themselves are illiberal, but that narrow doctrines are not repudiated with sufficient positiveness. The liberal doctrine should be insisted on that the law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice. Specialists are in most communities few and far between; the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge."

Louisiana seems to accord to the liberal view. In State v. Carter, 217 La. 547, 46 So.2d 897 (1950), the defendant was convicted of manslaughter. On appeal, the Supreme Court of Louisiana held that the refusal of the trial judge to permit a general practitioner to testify, as to whether an autopsy revealing certain facts would indicate heart disease on the ground that the witness was not a heart specialist, constituted reversible error:

"It will be observed that the only objection to the question made by counsel for the State and sustained by the court was that the witness was not a heart specialist. The fact that the witness was not a heart specialist might affect the weight to be given to his testimony, but it certainly did not affect its admissibility." 46 So.2d at 899.

Although the holding in *Carter* was based primarily upon Article 464 of the Louisiana Code of Criminal Procedure, LSA–R.S. 15:464, providing for the admissibility of opinion evidence of persons having special knowledge by reason of special training or experience as expert testimony, there appears to be no valid reason why the underlying principle ought not to apply to civil actions.

Q In your opinion, sir, was there or was there not malpractice?

A There was malpractice."

The fallacy underlying the proposition urged by defendant has been long exposed. See e. g., 7 Wigmore, Evidence §§ 1920, 1921 (3rd Ed. 1940). This court has recently rejected a similar contention in Kennelley v. Travelers Ins. Co., 273 F.2d 479, 482 (5 Cir. 1960). There, in a workmen's compensation case the district court had excluded testimony of a pathologist who performed an autopsy. This court reversed, holding admissible testimony as to whether the condition of the decedent's heart and arteries would have produced death without ruptures, as not invading the province of the jury.

■■■ Defendant has cited in its brief a number of older cases [9] from this circuit and elsewhere in support of its contentions as to the rule of evidence here in issue. These cases are inapposite not only because they are readily distinguishable but also because they simply do not stand for such an overbroad proposition. Rather, they support the correct rule, which is one of inquiry: whether the jury can received appreciable help from the witness. If the question is one which the layman is competent to determine for himself, the opinion testimony is excluded; if he reasonably cannot form his own conclusion without the assistance of the expert, the testimony is admissible. See generally 7 Wigmore, Evidence §§ 1917–1929 (3rd Ed. 1940), and cases cited therein.

■■■ A medical malpractice case is one of the classic examples of the *necessity* of expert opinion testimony as to the ultimate issue—indeed, it appears settled in most jurisdictions that a plaintiff in such a case cannot succeed without it. See note 4, supra.

■■■ Further considering defendant's argument as an attack upon the *language* used by plaintiff's expert, e. g., "Q In your opinion, sir, was there or was there not malpractice? A There was malpractice," our inquiry is whether defendant was unduly prejudiced by such testimony. After careful consideration of the record as a whole, we do not feel that these remarks of plaintiff's expert were unduly prejudicial or overwhelming. Rather, counsel's attack upon that witness, judging from the record as well as his brief, appears to bespeak his irritation with the doctor, who, perhaps because he was also a lawyer, was more articulate and convincing than the other physicians who testified.

Because the district court committed no error in the trial of the case, and for the reasons assigned, the judgment on the verdict in favor of plaintiff must be affirmed. Concluding as we do, however, that the district court abused its discretion in conditionally granting a new trial unless plaintiff remitted a substantial portion of the award, that portion of the judgment is reversed and the cause is remanded with instructions to reinstate the judgment for the full amount of the verdict.

Affirmed in part, reversed in part, and remanded with directions.

9. Most of the cases dealt with the question whether the medical witness was entitled to state his opinion with respect to whether claimants under war risk insurance policies were "permanently disabled" under the federal statute. The courts correctly excluded testimony of the physicians because it was obvious that juries were competent to reach the conclusion without expert assistance. See e. g., United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935).

In Carroll v. Magnolia Petroleum Co., 223 F.2d 657 (5 Cir. 1955), plaintiff was injured by collapse of an oil derrick. The district court admitted opinion evidence of a "tool pusher" as "expert" with respect to the cause of the collapse. Upon appeal to this court, we held that the admission of such opinion evidence was reversible error in that the jury was fully competent to determine for itself the cause of the accident:

"It must always be remembered that the jury is sitting to hear and decide the *facts*, and in a case like this one, to determine the real *cause* of the accident. * * *" 223 F.2d at 664. (Emphasis by the Court)