NORRIS, Judge.
The plaintiffs, Mr. and Mrs. Clayton Te-deton, sought damages for personal injury, emotional distress and loss of consortium as a result of alleged medical malpractice of the defendant, Dr. Leslie Coffman, a gynecologist and obstetrician. The plaintiffs contended that Dr. Coffman’s conduct fell below the standard of care for gynecologists because the total abdominal hysterectomy (“T.A.H.”) he performed on Mrs. Tedeton was not total and in fact left the cervix or a portion called the “cervical stump.” They also claimed Dr. Coffman committed malpractice by not informing them that the stump was still present. After a two-day bench trial, the court concluded that Dr. Coffman’s conduct did not fall beneath the applicable standard of care and rendered judgment rejecting the plaintiffs’ demands. Plaintiffs now appeal, urging the trial court erred in not finding substandard conduct. Unable to detect manifest error, we affirm.

Facts

Mrs. Tedeton first saw Dr. Coffman in June 1981 on referral from her urologist, who had treated her for a vaginal discharge. Mrs. Tedeton was also complaining of periods becoming irregular, of spotting and bleeding, of cystocele (leakage of urine into the vagina when she coughed), and hypertension. Dr. Coffman examined her and found in addition to vaginitis an enlarged and prolapsed uterus and bladder, plus a large, ulcerated cervix. He took a Pap smear which showed no infection. Dr. Coffman recommended a hysterectomy, but because Mrs. Tedeton weighed about a hundred pounds over her ideal body weight, he told her to consider dieting before any prospective surgery. She returned on July 1. Dr. Coffman examined her cervix under a colposcope (magnifier) and found nothing indicative of cancer. He performed cryosurgery on the ulcer, which he found was actually on ectropion, or tissue that was turned outward. The cervix was lacerated from obstetric injury and was partially everted (the inner tissue had moved outward). Dr. Coffman said this should not require surgery unless cancer was found.
Mrs. Tedeton next returned to Dr. Coff-man on August 31, not for a follow-up but for treatment of heavy bleeding. This had been occurring for some time; she was *37 passing large clots and Dr. Coffman considered it potentially serious. He had her admitted to Glenwood Regional Medical Center in West Monroe. According to his notes, he scheduled her for a D & C (dilatation and curettage) but she requested the T.A.H. instead, as she was not inclined to diet and she wanted to get the problem solved all at once. According to Mrs. Tede-ton, the doctor recommended a T.A.H. with salpingo-oophorectomy (removal of the uterine tubes and ovaries) in order to avoid future monthly problems. At any rate he proceeded to surgery on September 1.
Dr. Coffman described the operation in some detail at trial; his operative report was also admitted. He testified that he chose the abdominal over the vaginal approach because of potential difficulties with her surgery and the amount of blood she had already lost. Once he was inside, her obesity made it hard for him to reach the surgical site. In fact, in a T.A.H. the surgeon cannot see the cervix; he must operate by “feel.” Dr. Coffman discovered the uterus was retroverted and the ovaries full of adhesions. He therefore elevated the uterus and cut the adhesions. The enlarged uterus had adenomyosis, or in-growth of the uterine lining through the uterine wall, and endometrial hyperplasia, or abnormal thickening of the uterine lining. These were causing internal bleeding and could be treated only by hysterectomy. When he went to clip the ligaments he had difficulty because the “planes” separating the uterus from the bladder were partially destroyed. He was concerned about cutting through the plane and severing the bladder, rectum or ureter. In order to dissect and remove the uterus and cervix he used the “intrafascial technique,” which involved creating a new “plane” within the pubicervical fascia and separating the tissue along that plane. Dr. Coffman explained that this was not a universal approach, but it was his preferred method in cases like Mrs. Tedeton’s. He noted she was losing a lot of blood, so he postponed other contemplated repair work and physically removed the uterus and its attached cervix. He sent it to pathology for evaluation, feeling he had removed the entire uterus with its attached cervix. He acknowledged leaving at the top of the vagina some cervical columnar tissue that extended beyond the cervix itself and into the vaginal fornices; removing this would have required a wide-cuff vaginectomy. He stated that he did remove the bulk of the cervix and the cervical canal. Afterward he sutured together the top of the vagina, checked for bleeding, closed the peritoneum and then closed the wound in multiple layers. His operative report states that blood loss was about 800 c.c.; he testified that normal loss would be about 250 c.c. He concluded his report, “No known complications were encountered,” though he testified that he reserved the intrafascial technique for difficult surgeries and that Mrs. Tedeton’s was not a “perfect” situation.
Mrs. Tedeton stayed in the hospital for a week. The only undesirable symptom was post-operative fever. On her next office visit, September 8, she had fever which Dr. Coffman treated with antibiotics. By the next day her temperature was normal. On her next visit, September 14, she complained about a headache and blood clots passing through her vagina. Dr. Coffman said some bleeding was normal while the sutures melted and separated. On her next visit, September 23, she had no complaints and no bleeding. She scheduled a follow-up visit for three weeks hence but did not keep it. Dr. Coffman’s records show he performed visual exams on September 8 and 23. Both Mr. and Mrs. Tede-ton testified that sometime after the surgery, Dr. Coffman took them into his office, showed them an anatomy chart on the wall, pointed out the reproductive organs (including the cervix) and said these were totally removed from Mrs. Tedeton’s body. On questioning by the court, Dr. Coffman said he did not recall this incident; his usual practice was to show patients a chart in a spiral-bound book before surgery. He stated, however, that he thought he had removed the entire cervix, and this was his position.
Mrs. Tedeton paid a final visit to Dr. Coffman on November 30, 1981. Her com *38 plaint was hot flashes, which are common after the ovaries are removed. He gave her an estrogen injection and some pills. He examined her, noting that while the incision was healed, the vagina was not. He did not see any cervix, but testified that if he had seen her later he may have noticed it. Mrs. Tedeton never returned to Dr. Coffman, though his office called her several times between December 1981 and August 1982.
For some time after the operation Mrs. Tedeton thought everything was fine. She had, however, a recurrence of vaginal discharge so she went to see Dr. George Vari-no, the Ob-Gyn whom she had used from 1954 until 1973. Dr. Varino examined her on June 15, 1982, and said he thought he saw “cervix of uterus.” He got copies of the records from Glenwood and found they conflicted with his observation. This news affected Mrs. Tedeton badly; she went to several other doctors for their opinion. Dr. Ronald Anders in Ruston found what he assumed to be a cervical stump; Dr. Charles McFatter in Vicksburg found a mass at the top of the vagina and assumed it was cervix; Dr. Clyde Elliott in West Monroe saw “vagina clear, questionable uterus.” By the time of trial, Dr. Elliott had changed his opinion and thought he saw only an “atrophic tuck.” None of these doctors attributed her current discharge or pain to the cervical remnant. Only one, Dr. McFatter, mentioned the possibility of further surgery and this was only if complications arose. Dr. Elliott testified at trial; the others testified by deposition. After seeing Dr. Elliott, the plaintiffs filed this suit on May 27, 1983.
Starting in March 1984, Mrs. Tedeton began to see physicians and clinics for treatment of depression and psychological problems that she claimed arose from the knowledge that her cervix was still there, or from Dr. Coffman’s failure to “tell her the truth.” She claims to have been especially distraught over the prospect of cervical cancer, which she had trusted would no longer be a threat to her. Her mental treatment culminated in a three-week stay at LSU Med Center in April 1985, chiefly under the care of Dr. John Brauchi, whose deposition was admitted at trial. Dr. Paul Ware, another psychiatrist at LSU Med Center, examined her in June 1987 and testified at trial. Neither he nor Dr. Brau-chi could attribute Mrs. Tedeton’s emotional problems to the surgery.
Meanwhile, Mrs. Tedeton saw two Ob-Gyns at LSU Med Center. Dr. Adrienne Williams, an interne, examined her in August 1985 and found “what appears to be a cervix.” She later described it as “the entire of the portion vaginalis.” Her deposition was admitted at trial. Dr. Rose Brouillette, who testified at trial, examined her in July 1986 and found the cervix in place; she thought Mrs. Tedeton had received only a supracervical (subtotal) hysterectomy. Neither she nor Dr. Williams would link Mrs. Tedeton’s current problems to the cervical tissue they found. Mrs. Tedeton has taken Pap tests with numerous doctors; all have been negative.
The parties went to trial in December 1987. In written reasons for judgment, the trial court found that for an Ob-Gyn performing a T.A.H. the appropriate standard of care is generally to remove the uterus and cervix in their entirety. The court further found that in the event of difficulties such as Dr. Coffman experienced with Mrs. Tedeton, actions taken in the interest of the patient’s safety sometimes resulted in leaving a portion of the cervix. It thus concluded that under the circumstances Dr. Coffman’s surgical methods and medical care did not fall beneath the standard. The court also found, by the weight of the expert testimony, that the surgical site at the top of the vagina was not healed when Dr. Coffman last examined her; at this early time he could not be expected to discover the cervical remnant. Thus his failure to inform her was not substandard. Finding no act of malpractice, the trial court dismissed the Tedetons’ claims. They now appeal.

Discussion

In a malpractice action against a physician who practices in a particular specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by phy *39 sicians in that specialty; that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and that as a proximate result of this lack of knowledge or skill or failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. LSA-R.S. 9:2794 A; White v. McCool, 395 So.2d 774 (La.1981); Paul v. St. Paul Fire & Marine Ins., 430 So.2d 285 (La.App. 3d Cir.1983). Expert testimony is essential in establishing the standard in a technical field such as medical malpractice. Frasier v. Dept. of Health & Human Res., 500 So.2d 858 (La.App. 1st Cir.1986); Steinberg v. Indem. Ins. Co. of N. Amer., 364 F.2d 266 (5th Cir.1966). Under the appropriate standard of review, we are not to consider only so much of the evidence as will uphold or undermine the judgment, but rather the whole of the evidence with an eye to determining whether the judgment is plainly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial court is in a superior position to assess the credibility of witnesses and the weight of evidence than an appellate court. In the absence of clear error a reviewing court should adopt the trial court’s findings, even if another conclusion seems equally reasonable. Arceneaux v. Domingue, supra; Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.1987), writ denied 506 So.2d 1231 (La.1987). The manifest error rule also applies to deposition evidence. Virgil v. Amer. Guar. & Liab. Ins. Co., 507 So.2d 825 (La.1987).
The trial court found that a gynecologist performing a T.A.H. should, as a general rule, remove the uterus and cervix in their entirety; this was the unanimous opinion of the experts. The court also found that a portion of Mrs. Tedeton’s cervix remains. To reconcile the apparent breach of standard, the court further found that
[Wjhen confronted with the difficulties that Dr. Coffman experienced during the surgery, the physician makes the best of the situation, keeping the safety of the patient paramount. * * * [Tjhis would include leaving a portion of the cervix.”
It further found the plaintiffs did not prove that Dr. Coffman was, or should have been, aware of the cervical remnant by the time of the last office visit and thus was not remiss in failing to inform the Tedetons of it.
The appellants claim by their first specification of error that leaving in part of the cervix was indeed substandard conduct. We have carefully examined the evidence that bears on this issue.
Most of the plaintiffs’ experts discussed potential problems in operations of this type. Dr. McFatter, who saw Mrs. Tedeton one time, assumed the mass he saw was a portion of her cervix. He stated by deposition that disease or the size of the patient would justify use of the intrafascial technique but that the entire cervix should have been removed absent an emergency. He conceded, however, that obesity was a recognized problem in hysterectomies. Dr. Anders saw Mrs. Tedeton twice, finding tissue that looked like exocervix at the apex of the vaginal vault. He stated by deposition that the presence of adhesions and other conditions made this a difficult operation and justified use of the intrafas-cial technique. He said this technique usually would not prevent the surgeon from getting the entire cervix, but it could conceivably happen in certain cases. Dr. Brouillette examined Mrs. Tedeton once and saw the exocervix. She testified that “occasionally” there is difficulty in surgery that justifies leaving in an undiseased portion of the cervix. These experts were not asked whether they thought Dr. Coffman’s conduct in leaving part of Mrs. Tedeton’s cervix was substandard (though several stated that failure to inform her of the remnant was). Dr. Williams did not discuss surgical complications and was not familiar with the intrafascial technique. She stated, however, that almost all the patients she saw had a cervix.
The plaintiffs’ other expert, Dr. Varino, stated by deposition that “sometimes” in the course of surgery, there were complications that would justify leaving in part of the cervix. He had reviewed Dr. Coff- *40 man’s operative report and knew that Mrs. Tedeton had excessive bleeding, adhesions, an enlarged uterus, and was obese. He described the operation as difficult. He felt that Dr. Coffman intended to remove the whole cervix and thought he had succeeded. In response to a specific question, he declined to say that Dr. Coffman’s conduct in surgery was substandard. Varino’s Dep., 10.
The defense experts also outlined potential difficulties in a surgery like Mrs. Tede-ton’s. Dr. Jarrell examined her and saw what appeared to be a small portion of exocervix at the top of the vagina. He said he used the intrafascial technique for his most difficult cases, which accounted for 5-10% of his hysterectomies. He mentioned excessive bleeding, adhesions and the patient’s obesity as complicating factors. Faced with these problems, a surgeon who was exercising his best judgment and taking care not to injure the surrounding organs “might” leave in part of the cervix; he himself did it very infrequently. Dr. Jarrell reviewed all of Mrs. Tedeton’s medical records and heard the expert testimony at trial. On the basis of this and his examination of Mrs. Tedeton, he concluded that Dr. Coffman’s surgical conduct was not beneath the standard of care. R.p. 391. Dr. Shemwéll, a professor of Ob-Gyn at LSU, also reviewed Mrs. Tedeton’s records as well as Dr. Coffman’s deposition.* He cited the same complicating factors and added another, endometriosis. He thought Mrs. Tedeton’s condition made the intrafas-cial technique appropriate. He stressed her obesity. He testified that leaving part of the cervix was “common” in difficult cases, and that in abdominal surgery, the doctor cannot see the cervix but must work by “feel.” He stated that even in the exercise of his best judgment and ability, an Ob-Gyn sometimes left in a portion of the cervix. He did not feel that Dr. Coffman’s surgical conduct was substandard.
Dr. Coffman testified without contradiction that he faced difficulties such as obesity, excessive blood loss, adhesions and a very poor pubicervical fascia. These are precisely the kinds of problems the experts recognized might complicate the process and justify leaving in part of the cervix. He testified he used the more involved in-trafascial technique in order to avoid damaging other structures.
In sum, the expert testimony classified adhesions, enlargement and bleeding as factors that might cause a surgeon who was exercising his best care and judgment to leave a small portion of cervical tissue unintentionally. Since the experts were basically unequivocal in characterizing Mrs. Tedeton’s symptoms as genuine difficulties, the trial court did not commit manifest error in finding that Dr. Coffman’s performance of the surgery met the standard of care.
By their second specification, appellants urge that Dr. Coffman’s failure to discover and inform them of the cervical remnant was indeed substandard conduct, and the trial court’s contrary conclusion is plainly wrong. The trial court’s rationale was essentially as follows. Because of the surgery, swelling, healing process and other related factors, a period of time is required after surgery before a physician can determine on pelvic examination whether the cervix was entirely removed. The experts offered varying estimates of when the vagina would be healed enough to permit a fair view without endangering the healing process. Dr. Coffman’s last examination was only twelve weeks post-op, or before adequate healing had occurred, so he cannot be charged with finding and disclosing the fact that part of the cervix remains.
The evidence does not undermine this conclusion as manifestly erroneous. Dr. Brouillette testified that sometimes a physician must wait six weeks to see whether any cervix remains. Dr. Jarrell said that by November 30, when Dr. Coffman last examined Mrs. Tedeton, he could “not necessarily” tell, though the usual healing *41 time is eight weeks. Dr. Shemwell placed it at four to six months, or as long as a year, and he did not think Dr. Coffman could see the cervix by November 30. Dr. Varino said Dr. Coffman should have seen it “after she healed” but did not state when this would have been. Dr. Coffman testified that as of November 30, the vagina was not completely healed; if he had seen her later, he would have noticed any cervical remnant. R.p. 364.
Given these various estimates of healing time and Dr. Coffman’s direct testimony that as of the last examination Mrs. Tede-ton was not completely healed, the trial court was certainly entitled to conclude that Dr. Coffman’s conduct was not substandard. The doctor was not obligated to disclose to the plaintiff information that he could not be expected to observe. The trial court’s finding is not plainly wrong and these specifications do not present reversible error.
In addition to the appellants’ two specifications, they argue throughout that Dr. Coffman’s defense strategy is fatally flawed by inconsistency. This arises from his early claim that he intended to remove, and believed he had removed, the entire cervix successfully; and from the plaintiffs’ interpretation of his later claim to the effect that when the evidence became overwhelming, he intentionally elected to leave in some cervix because of surgical emergencies. The plaintiffs contend that if Dr. Coffman intentionally left some cervix, then his initial assertion of intentional, complete removal destroys his credibility and his defense.
The trial court apparently did not share appellants’ assessment of this alleged inconsistency and the evidence does not undermine its conclusion. Dr. Coffman testified that he intended to remove the entire cervix and believed he had done so; the pathology report and his post-operative exams supported his belief. Drs. Shemwell and Anders strongly corroborated his position. Even Drs. Varino and Anders, who were the plaintiffs’ experts, stated that his position was reasonable. Varino’s Dep., 18; Anders’s Dep., 23. The record supports a conclusion that Dr. Coffman never contended, either before or after he learned of the other doctors' findings, that he intentionally left a portion of the plaintiff’s cervix in response to difficulties he encountered during the operation. The evidence rather supports the trial court’s conclusion that the standard of care does not result in total removal of the cervix in every case. We cannot say this is plainly wrong.
For the reasons expressed, the judgment appealed from is affirmed at appellants’ costs.
AFFIRMED.

 Plaintiff s counsel used this deposition in an attempt to impeach Dr. Coffman. He did not introduce it into evidence.