612 So.2d 996 (1993)
Retha R. ELLIOTT, Plaintiff-Appellant,
v.
Dr. E.B. ROBINSON, Defendant-Appellee.
No. 24290-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1993.
Rehearing Denied February 18, 1993.
*998 Law Offices of Edmund M. Thomas by Edmund M. Thomas, Law Offices of James Don Thomas by Thomas M. Lockwood, Baton Rouge, for plaintiff-appellant.
Mayer, Smith & Roberts by Paul R. Mayer, Jr., Shreveport, defendant-appellee.
Before NORRIS, VICTORY and STEWART, JJ.
NORRIS, Judge.
The plaintiff, Retha R. Elliott, appeals a judgment that dismissed her medical malpractice claim against Dr. E.B. Robinson, a general surgeon who performed a carpal tunnel release on her left hand in February 1984. On appeal she urges that Dr. Robinson breached the standard of care by failing to offer her a course of conservative treatment, which would have obviated the need for surgery, and by negligently injuring the motor and sensory branches of her median nerve during the surgery; and that as a result of these injuries she suffered causalgia, pain syndrome and permanent disability of her thumb. Finding that the trial court committed manifest error in rejecting each of these claims, we reverse and render.

Factual background
At the time of the surgery giving rise to this claim, Mrs. Elliott was a 51-year old rural mail carrier in Haughton, Louisiana. She had prior experience with carpal tunnel syndrome in her right hand in the late 1960s and early 1970s, when she was doing office work operating business machines. The carpal tunnel is a space deep in the tissues of the wrist, on the same side as the palm of the hand. It is bounded on three sides by the carpal bones and on one side by a ligament. Through the carpal tunnel run several tendons and the median nerve, which supplies sensation to parts of the hand and motor function to the muscles in the thumb. Carpal tunnel syndrome ("CTS") is an irritation of the median nerve by fibers of the transverse carpal ligament; it is usually caused by repetitive finger and wrist motion.
Mrs. Elliott testified that when the first symptoms of CTS appeared in her right hand in the 1960s, a Dr. Martin put her hand in a cast for six weeks, after which she wore a splint intermittently for two or three years; she felt that this "staved off" surgery. R. p. 590. By 1970, however, she saw Dr. Rayburn, a former partner of Dr. Robinson's, and he recommended a carpal tunnel release. She underwent the surgery in April 1971; although Dr. Rayburn's office records show that she may have had some residual numbness, Mrs. Elliott testified that the 1971 surgery relieved her symptoms.
In 1976 Mrs. Elliott became a rural mail carrier. This job requires quick, repetitive manual work such as sorting and binding the mail, loading it into her car, and driving her delivery route. Sometime in 1983 she began to experience numbness in her left hand, similar to that which had prompted the therapy and surgery in the right hand years before. These symptoms, however, were not very severe and usually abated after she gave her left hand "a couple of slings." R. p. 537. Suspecting CTS, Dr. Robinson sent her in January 1984 to Dr. Winston Brown, a neurologist, for a nerve conduction study. Dr. Brown found her "sensory latency" prolonged and diagnosed a "mild focal neuropathy in the distal aspect of the [median] nerve, probably at the carpal tunnel." Dr. Robinson suggested surgery to release the median nerve. He testified that he offers conservative treatment only in rare, specific instances; for active people who use their hands in repetitive movement, conservative treatment is a disservice as CTS is bound to recur, so he prefers to go straight to surgery. R. p. 481.
About a week later, on January 31, Mrs. Elliott had a spell in which she "went blind" momentarily, followed by several hours of blurred vision and tingling in her scalp. She went to Dr. Robinson, who promptly sent her to Bossier Medical Center. Although Mrs. Elliott insists she did *999 not want the carpal tunnel release, Dr. Robinson's office notes show that this was one of the reasons for admitting her. At the hospital she was examined by a neurosurgeon, Dr. Warren Long, who could not discern any "defined, neurological symptoms" to explain her spell; however, he saw no reason to defer the carpal tunnel release. Mrs. Elliott signed a consent for this surgery (though she adamantly denied this, the document is present in the hospital records) and Dr. Robinson performed it on February 1, 1984.
Dr. Robinson's operative notes state that he identified and "spared" the median nerve through its entire length. He excised the transverse carpal ligament and freed the nerve down into the distal palm and up into the forearm. He testified that the operation went well; his office notes report that within the first two or three weeks after surgery Mrs. Elliott told him the operation helped her and she did not feel numb any more. Mrs. Elliott, however, testified that she awoke from surgery with excruciating pain in her left thumb, unlike anything she had suffered before. She described this pain as "like fire" or like a "catch" that needed to be "pulled." R. pp. 555, 608. The pain persisted, Mrs. Elliott said, even after she went home the next day with her hand in a cast, and afterwards. She did, however, resume delivering mail about two weeks later with the help of her husband, a retired postal carrier. Because of the pain, she had to keep her hand wrapped, which interfered with her work.
Dr. Robinson's office records noted that on February 23 she complained her wrist was "somewhat stiff" and she could not flex it; by March 3 he noted multiple complaints again and remarked in his office notes that it was "going to be real hard to get a good result in this case." R. p. 521. On March 15 Mrs. Elliott complained that she was getting weaker in the hand, but Dr. Robinson told her this had nothing to do with the surgery; she also still had pain when moving her thumb. Feeling she was making no progress, Mrs. Elliott asked Dr. Robinson for a referral and did not return to him.
On March 26 she went to Dr. F.C. Boykin, a neurologist. She reported pain starting in her thumb and running up her wrist; slight weakness in the left hand; weakness when abducting the left thumb (stretching the thumb across the palm); and slight weakness in opposing the left thumb to the little finger (pressing them together).[1] Dr. Boykin noted a loss of muscle mass in the thenar eminence (fleshy part at the base of the thumb), which is often associated with lack of nerve supply, and a purplish discoloration of her wrist. He recommended an EMG to verify this, while noting possible tendinitis in the left thumb.
Mrs. Elliott returned to Dr. Brown on March 28 for the EMG and a nerve conduction study. The EMG showed patterns of denervation in the left thenar eminence, apparently of recent origin and suggesting a partial interruption of the nerve supply. The nerve conduction study, however, was within normal limits, leading Dr. Brown to conclude that the February operation was successful in its intended result. R. p. 368. He noted in his April 26, 1984 report that she had normal strength for "opposing the thumb across the palm," but could not recall asking her to press the thumb to each finger (the motion that other witnesses described as opposition). Ex. P-5; R. p. 384. Mrs. Elliott did complain of constant soreness and intermittent pain in the base of her thumb, and of mottled, discolored skin on her wrist. Dr. Brown referred her to Dr. Clinton McAlister, an orthopedic surgeon, in early May.
Dr. McAlister recorded her complaints of diffuse pain and soreness; he also found that she could not oppose her thumb and had decreased sensation in her median nerve distribution. He diagnosed a post-operative CTS, possibly caused by a neuroma on the palmar cutaneous branch of the median nerve. A neuroma is an aberrant, coiled-up growth of a nerve after the nerve has been cut or traumatized; the palmar *1000 cutaneous branch is a part of the median nerve that supplies sensation. Dr. McAlister placed her on therapy and monitored her closely for the next several months. Her soreness abated periodically but her overall progress was slow. In June he ordered another EMG, and this one was performed by Dr. Brown's partner, Dr. Robert Schwendimann. It showed continued evidence of denervation in the muscles innervated by the median nerve, but also some evidence of re-innervation.
Feeling that conservative treatment was better, Dr. McAlister kept Mrs. Elliott on therapy for some time. However, she was not regaining the full use of her thumb so he suggested an operation to transfer a tendon from her ring finger to the left thumb. Also as part of the surgery, Dr. McAlister would open and reexamine the carpal tunnel for further compression. Mrs. Elliott underwent the second surgery in November 1984.
Dr. McAlister described the surgery at some length, as will be noted below. In salient part, he found a neuroma on the palmar cutaneous (sensory) branch of her left median nerve. On the motor branch he found "no definite neuroma," but observed that the nerve disappeared into scar tissue in the thenar eminence, where the muscle appeared denervated. He also performed the tendon transfer.
Mrs. Elliott testified that this surgery kept her off work for 11 days and relieved her symptoms. The pain in her thumb all but completely dissipated, but still persists at the base of her hand and her wrist. Her hand still bothers her at night and is sensitive in cold weather.
Dr. McAlister monitored her progress after the surgery and noted her continued complaints. By October 1985 he felt she had reached maximum cure. Some months before trial in September 1991 her complaints increased, but Dr. McAlister attributed this to degenerative, arthritic changes. Even without the arthritic symptoms, he assessed a 30% permanent disability of her left thumb.
Another physician, Dr. Kenneth Gaddis of Thibodaux, examined her shortly before trial and verified her complaints of pain, temperature sensitivity, intermittent swelling and weak grip. He diagnosed pain syndrome and causalgia, a condition resulting from the healing of a nerve. R. p. 293.

Procedural history and action of trial court
Mrs. Elliott filed a request for review of claim apparently in June 1985.[2] A medical review panel was convened, consisting of Dr. Marion Milstead, who testified for the defense at trial, Dr. A.A. Bullock, whose deposition was introduced by the defense at trial, and Dr. Donald R. Smith. The panel's opinion, handed down in February 1988, stated that the evidence did not support the conclusion that Dr. Robinson failed to meet the applicable standard of care, and that the conduct complained of was not a factor of the asserted resultant damages. The panel similarly absolved Bossier Medical Center, which had also been named in the request for review.
The instant petition followed in May 1988, naming both Dr. Robinson and Bossier Medical Center as defendants. Extensive discovery was conducted; Mrs. Elliott dismissed Bossier Medical Central from the suit without prejudice in January 1991. She and Dr. Robinson proceeded to a four-day bench trial in September 1991.
By written opinion the trial court found that Dr. Robinson did not breach the standard of care by performing surgery before attempting conservative treatment. In support, the court cited two plaintiff experts, Dr. McAlister and Dr. Sigurd Sandzén, who, according to the court, "agreed" that it was no deviation from the standard of care for Dr. Robinson to recommend surgery. The court cited these witnesses and defense expert Dr. Milstead to hold that a surgeon may, within his professional *1001 judgment, recommend one course of treatment over anotherthus holding that these doctors approved of forgoing conservative treatment in favor of immediate surgery to correct a mild case of CTS.
The court next found that Dr. Robinson did not deviate from the standard of care in causing the neuroma on the palmar cutaneous branch of Mrs. Elliott's median nerve; although several experts felt this "could possibly" have been caused by negligent laceration during the February 1984 surgery, "most agreed that scar tissue or other trauma not associated with surgery could have caused the neuroma." The court also cited Dr. Milstead's opinion that there was no specific evidence to show the nerve was cut. R. p. 224. As for injury to the motor branch, the court credited Drs. McAlister and Milstead with testifying that "more likely than not" the weakness and pain in her thumb resulted from scar tissue on the motor branch, a natural consequence of surgery, and not from negligence on Dr. Robinson's part. Id.
Finally the court discounted Mrs. Elliott's current complaints of pain syndrome or causalgia, on the basis that (1) her lead witness, Dr. Gaddis, saw her only one time, two weeks prior to trial; (2) she went from March 1986 until March 1990 without seeing any doctor; (3) when she finally went back to Dr. McAlister in March 1990, he diagnosed an unrelated condition, arthritis; and (4) at that time she did not report symptoms of causalgia. The court rejected her claims by judgment of February 10, 1992 and this appeal followed.

Synopsis of medical evidence
Mrs. Elliott presented the testimony of five medical experts, three at trial and two by deposition, as well as examination of Dr. Robinson as an adverse witness.
Dr. Kenneth Gaddis, a board-certified neurologist, established that many medical specialists (neurologists, general surgeons, orthopedic surgeons, neurosurgeons and plastic surgeons) may treat CTS, but all share the same standard of care as to diagnosis and non-surgical treatment. Early symptoms of CTS are usually numbness or tingling in the fingers and hand, especially at night or after repetitive manual motion; all physicians should take the patient's history, perform a physical exam, and then do a nerve conductions study and EMG in order to diagnose CTS and exclude other problems. Once CTS is diagnosed, there are three forms of treatment: no treatment, suitable only for very mild cases; medical or conservative treatment (such as the use of a splint, injections of anti-inflammatory drugs and perhaps vitamins, and leaving off the aggravating activity), suitable for most mild cases; and surgical treatment, suitable if conservative treatment fails or the symptoms are very advanced. Dr. Gaddis testified that the standard of care in diagnosing and treating CTS required implementing conservative care unless the symptoms included muscular atrophy or poor nerve conduction test results. Only with these severe symptoms would he recommend surgery at the outset. R. p. 263.
Dr. Gaddis reviewed and summarized Dr. Robinson's office records. Although he felt that Dr. Robinson did not perform adequate tests conclusively to diagnose CTS in January 1983, he agreed it was permissible to offer her no treatment at that time, given her mild symptoms. In January 1984, however, when the nerve conduction study verified mild CTS, the standard of care required Dr. Robinson to offer Mrs. Elliott a course of conservative treatment; by failing to do so, he breached the standard. R. p. 277. On cross examination Dr. Gaddis agreed that the decision to operate should be made between doctor and patient, and that conservative treatment would have required Mrs. Elliott to curtail her manual activity. R. pp. 299, 304. He reiterated, however, that a patient with mild CTS should not consider surgery unless conservative treatment has failed. R. p. 304.
Dr. Gaddis also reviewed Mrs. Elliott's post-operative records. Because she complained of pain to hospital personnel shortly after the surgery, and because Dr. McAlister later found the neuroma, Dr. Gaddis concluded that Dr. Robinson must have cut *1002 or traumatized the palmar cutaneous branch of her median nerve during surgery. R. pp. 289-290. Dr. Gaddis also viewed the results of the March 28 EMG, and Mrs. Elliott's documented complaints (mild atrophy, discoloration and loss of opposition) as evidence of denervation of the motor branch as well. R. p. 285. Because these symptoms arose soon after the February 1 surgery, he felt they must have been caused by that surgery and not by normal scarring, which would have taken longer to develop. Dr. Gaddis explained that the improved EMG reading of June 12 suggested the partial repair of an injured nerve rather than gradual compression by scar tissue. As noted, he examined her in September 1991, recording complaints of pain, temperature sensitivity and intermittent swelling, which he identified as symptoms of causalgia. He concluded that Dr. Robinson must have injured Mrs. Elliott's median nerve in at least one place, with the result of causing her sensory and motor problems. R. pp. 291-292. He definitely linked her residual condition, causalgia and pain syndrome, with this injury.
Dr. Winston Brown, a board-certified neurologist, testified about the tests he gave Mrs. Elliott. At Dr. Robinson's request, he gave her a nerve conduction test on January 23, 1984; this showed that her motor function was normal but her sensory function was below normal. Dr. Brown diagnosed a mild focal neuropathy of the left median nerve, probably at the carpal tunnel. R. p. 362. He did not order an EMG. He next tested her on March 28, nearly two months after the surgery, when she was complaining of constant soreness and intermittent pain unlike what she suffered before the surgery. This nerve conduction test showed improvement, leading him to say the surgery was successful in its intended result. R. p. 368. The EMG, however, was abnormal in the left thenar eminence, evidencing a partial interruption of nerve supply to the muscles in the base of the thumb, probably of recent origin; the thenar eminence also showed some atrophy. On April 26 Mrs. Elliott reported the same symptoms, and Dr. Brown noted the skin on her wrist was mottled. This suggested causalgia, a condition resulting from partial injury to a nerve. Dr. Brown added that a subsequent EMG by his partner, Dr. Schwendimann, showed denervation in all three muscles of the thenar eminence, but some evidence of re-innervation. R. p. 390. Dr. Brown felt that Mrs. Elliott's atrophy was caused, at least in part, by loss of nerve supply; this was less likely the result of scar tissue formation than of surgical insult at the time of the operation. R. p. 392.
Dr. Clinton McAlister, an orthopedic surgeon, first saw Mrs. Elliott on May 7, 1984, on Dr. Brown's referral. She was unable to oppose her thumb and complained of diffuse soreness over her left hand and wrist. As noted above, Dr. McAlister diagnosed a post-operative CTS. He testified that only three months after surgery a patient's pre-operative symptoms may remain unresolved; he placed Mrs. Elliott on conservative treatment. He described conservative treatment as avoiding the offending conduct, wearing a splint at night and injecting anti-inflammatory drugs. He testified this form of treatment can relieve the symptoms of CTS and will sometimes completely resolve them, but he would not state that there is a standard of care as to when the physician should move from conservative to surgical treatment. R. p. 420. He said some people feel conservative treatment is ineffective and therefore go to immediate surgery, but his own personal approach is conservative treatment for a case like Mrs. Elliott's. R. pp. 420-421.
Dr. McAlister saw Mrs. Elliott several times over the next few months. Although her symptoms persisted, he felt that the evidence of re-innervation in the June EMG counseled further conservative treatment. By August he was discussing the merits of a second surgery. He testified that division of the median nerve is a possible risk of carpal tunnel surgery, but admitted that he himself does not ever mention this to his patients. R. pp. 427-428.
Dr. McAlister performed the surgery on November 12, 1984. As noted, he found a neuroma on the palmar cutaneous branch of the median nerve, proximal to the transverse *1003 carpal ligament. Without precisely defining neuroma, he testified that one may be formed by nerve fibers that have been incised or that have fused with surrounding tissue called adventitia, when the whole has been subjected to trauma. He was clear, however, that any nerve that has been incised will form a neuroma. R. p. 432. He did not think re-innervation could occur in an incised nerve, but was possible in a case of partial incision. Although he described the February 1984 surgery as only a "possible" cause of the neuroma, he admitted there was nothing else in Mrs. Elliott's history to explain it. R. P. 435. He added that in performing a carpal tunnel release, if the surgeon cuts the palmar cutaneous branch, in the absence of complications that obscure the location of the nerve, then either the nerve is out of place or the surgeon is cutting out of place; Mrs. Elliott's nerve appeared to be in the normal place. R. pp. 467, 438.
As for the motor branch of the median nerve, Dr. McAlister testified that he traced it out until it entered the thenar eminence, where there was scar tissue. Scar tissue is an inevitable consequence of the earlier surgery, he explained. He found the thenar muscles were denervated, but he did not explore the area because the large amount of scarring increased the risk of injuring the nerve. He found no compression on the portion of the motor branch that he traced out. In response to a general question, Dr. McAlister replied that he did not think Dr. Robinson breached the standard of care owed to Mrs. Elliott. R. p. 465.
Dr. McAlister followed her progress for several months, noting improved function but residual soreness. In 1990 she came to him with soreness in the carpometacarpal joint of her left thumb; he diagnosed this as osteo/degenerative arthritis, unrelated to the earlier condition. Even without the arthritic changes, he assessed a 30% permanent disability of her left thumb.
Dr. Robert Muckleroy, a specialist in physical medicine and rehabilitation in Dallas, testified by deposition. His practice is almost totally concerned with EMGs, and he reviewed Mrs. Elliott's EMG and nerve conduction study results. He agreed with Dr. Brown's interpretation of the January 1984 nerve conduction study. The March 28 EMG showed 2+ fibrillations in the opponens pollicis muscle. According to Dr. Muckleroy, this can result only from the death of an axon (the working part of a nerve) in the motor branch of the left median nerve. He testified that this reading could not possibly have resulted from surgical scarring, as only seven weeks had passed since surgery; scarring of such magnitude would require at least six months to form. Muckleroy Dep., 9. His opinion was that during the February 1 surgery, some injury occurred to Mrs. Elliott's motor branch, most likely a partial severance of the nerve since some impulse conducting function was still present. Id., 11.
As for the palmar cutaneous branch, Dr. Muckleroy testified that a neuroma is positive proof that a nerve has been cut; while not all cut nerves form neuromas, all neuromas result from cut nerves. Id., 13. On cross examination he conceded that if a nerve were pulled or stretched severely enough, it could cause a neuroma, but he believed that Mrs. Elliott's palmar cutaneous branch had been cut. Id., 18.
Dr. Sigurd Sandzén, clinical professor of orthopedic surgery at Southwestern Medical School in Dallas, testified by deposition. The author of four dozen articles on orthopedics and two technical books ("atlases") on the hand, Dr. Sandzén concentrates on hand surgery. After demonstrating how he would diagnose CTS, he testified that the standard of care for a mild to moderate case is conservative treatment, which would include restricting the hand's motion, putting it in a splint at night, and injecting non-steroidal anti-inflammatory drugs and vitamins into the carpal tunnel. If this failed, he would recommend surgery, but only after discussing its risks and benefits with the patient. On cross examination he stated that restricting the hand's motion can mean altering the patient's vocation or avocation, but nevertheless "conservative treatment should be tried before any surgical intervention, and this should *1004 be brought to the patient's attention." Sandzén Dep., 58-59. A decision to skip conservative treatment "could" be appropriate, but it must be the patient's choice.
When surgery is performed, Dr. Sandzén testified, the surgeon must know where the median nerve and tendons are, and avoid injuring them. Id., 25. In Mrs. Elliott's case, the presence of the neuroma on the palmar cutaneous branch of her left median nerve led him to conclude that nerve was lacerated during surgery by Dr. Robinson. Id., 28. He admitted that certain complications can arise in surgery that justify a non-negligent injury of the nerve, but no such factors were mentioned in Dr. Robinson's surgical report, so Dr. Sandzén opined that this injury could not occur "in the absence of negligence." Id., 32.
He also concluded that the motor branch of Mrs. Elliott's left median nerve must have been injured by Dr. Robinson in surgery. Normal surgical scarring can compress the median nerve, producing atrophy and fibrillations, but Dr. Sandzén had never seen scarring extensive enough to cause these symptoms a mere seven weeks post-op. Id., 29. He added that this scarring probably did not predate the February 1 surgery, as Dr. Robinson's surgical report does not mention observing it then. Dr. Sandzén stated that injuring the motor branch was a deviation from the standard of care. Id., 27.
In his defense Dr. Robinson called Dr. Marion Milstead, a Shreveport orthopedic surgeon with a subspecialty in hand and microvascular surgery; he served on the medical review panel. He testified that he generally tries conservative treatment for CTS unless the patient's EMG shows denervation or the patient cannot bear the pain. He initially stated that no standard of care governed the decision to proceed to surgery, but later admitted that the standard requires conservative treatment for a patient with mild, intermittent symptoms and no atrophy or dysfunction. R. pp. 637, 655. Even so, he felt the patient's ability to tolerate her pain is the main consideration. He was not sure of Mrs. Elliott's level of pain just prior to surgery. R. p. 656.
When asked about the motor branch of Mrs. Elliott's median nerve, Dr. Milstead testified that scar tissue can form around a nerve, causing pain and discomfort and secondary atrophy; the pathology report did not show that any nerve tissue was found in the excised tissue; Mrs. Elliott did not complain of problems moving her thumb until the third post-op office visit; and Dr. McAlister did not find any neuroma on the motor branch. On this basis Dr. Milstead concluded there was no evidence that Dr. Robinson injured the motor branch; the injury was more likely an acceptable risk of retraction and post-operative scarring. R. pp. 644-645. On cross examination he admitted that he had never personally observed scar tissue grow to the point of compressing a nerve in so short a time as in Mrs. Elliott's case, and that a pathology report alone will not disclose whether a nerve has been cut unless a segment of nerve tissue was included in the excised sample. R. p. 685.
As for the palmar cutaneous branch, Dr. Milstead first testified that incisions on this part of the nerve are an "accepted surgical fact" and occur "quite frequently"; however, he later admitted that cutting the nerve without a proper explanation would be a deviation from the standard of care. R. pp. 647, 659. He also stated that a neuroma can result not only from incision of the nerve but from retracting it during surgery. R. pp. 647-648. Finally Dr. Milstead testified that causalgia is a serious pain condition, often permanent and usually the result of a cut nerve. R. p. 680.
Dr. A.A. Bullock, a retired general surgeon, served on the medical review panel and testified by deposition for the defense. He was on the staff of the old Charity Hospital in Shreveport when Dr. Robinson was in training there. He has performed only half a dozen or so carpal tunnel surgeries in his career. Bullock Dep., 23. He testified that CTS should be treated conservatively, unless there is evidence of "muscle wasting," anesthesia and rather advanced nerve pathology; this is prudent medical practice. Id., 26-27. Conservative care entails splinting, injecting cortisone *1005 and using non-steroidal anti-inflammatory drugs.
Dr. Bullock testified that a neuroma can result from cutting a nerve and tendon, pulling a nerve or trying to dissect around it, nicking it, and less commonly by blunt injury. Id., 29. Thus he did not consider the neuroma on Mrs. Elliott's palmar cutaneous branch definite evidence of a cut nerve. However, he testified that cutting the median nerve or any of its branches would be a deviation from the standard of care. Id., 24. He also testified that if her palmar cutaneous branch were only partially severed, she would initially feel numbness or tingling; as the neuroma grew, she would have more symptoms. Id., 37.
Dr. Bullock testified there was no specific evidence of injury in the surgical report, and conflicting evidence as to when Mrs. Elliott's paralysis set in; thus he concluded that Dr. Robinson "probably" did not cause the injury at the time of surgery. Id., 31. He relied on the fact that as of April 26, Dr. Brown reported that she could oppose her thumb; this, in his opinion, made it far more likely that "there is some kind of a process that is going on following the surgery that caused this rather than the surgery itself." Id., 33. However, he did not hear Dr. Brown's trial testimony setting out a more relaxed understanding of "opposition."
Dr. Robinson, the defendant, is a general surgeon and Diplomate of the American Board of Surgery. He testified that in treating CTS, physicians of any specialty must meet the same standard of care. He does not consider conservative care of CTS ineffective, and offers it in specific instances; however, in a prior deposition, he indicated he would go to surgery unless there were compelling reasons to avoid it. R. p. 480; Robinson Dep. (5/22/86), 17. He testified that in active people who use their hands repetitively, conservative treatment is a disservice and not the standard of care, as CTS will inevitably recur. R. p. 481. Before performing the surgery, he had Dr. Long evaluate Mrs. Elliott, finding no reason not to proceed. Dr. Robinson's records did not show, and he could not independently recall, whether Mrs. Elliott had atrophy prior to surgery, but he felt that she did not; also without record, he testified that she had weakness in her hand, although at the deposition five years earlier he said there was no impairment of motion. R. p. 484; Dep., 38. He could not remember discussing the benefits and risks of the surgery with Mrs. Elliott, but he was "sure" he did so. R. p. 503. Nowhere in his testimony does he state whether he considered Mrs. Elliott's CTS mild, moderate or severe.
Asked about the surgery, Dr. Robinson denied that he cut or surgically injured either the motor or the palmar cutaneous branch of Mrs. Elliott's left median nerve. Even so, he testified, the standard of care permits a surgeon to cut part of the median nerve, provided there was some specific reason for so doing; in deposition he said more simply, "Anything you are not supposed to cut, he is supposed not to cut. That's right." R. p. 476; Dep., 35. He admitted that his response at trial was different. R. p. 478.
Referring to his operative report, Dr. Robinson testified that he "identified and spared" the median nerve through its entire length, excised the carpal tunnel ligament, freed the nerve down into the distal palm as well as into the forearm, all the while avoiding contact with the nerve. R. p. 514. He took the covering off the motor and palmar cutaneous branches to look for constricting bands, and had no difficulty identifying the nerve. R. p. 515.
Mrs. Elliott did not complain to him about pain after the operation; he was not certain, but he probably told her she would recover in three to four weeks. On February 10 she told him the operation had helped. By February 23, however, her wrist was stiff and sore, and she could not flex it; on March 5 she reported numbness for the first time. Then Dr. Robinson commented in his office notes, "It's going to be real hard to get good result in this case." On March 15 her hand was getting weaker; Dr. Robinson told her this had nothing to do with the surgery. She also had pain on *1006 abducting her thumb. The next day he referred her to a neurosurgeon.
Dr. Robinson did not know what caused the result here; he felt that partial injury to the motor branch was only a remote possibility, apparently because it is so small. R. p. 507. Partial injury to the palmar cutaneous branch was also unlikely because it innervates only a small portion of the palm and does not go out to the fingers. Id. He admitted that a possible cause was scar tissue entrapment, but there was no way positively to identify why her CTS recurred. R. p. 509.

Applicable law
In a malpractice action against a physician who practices in a particular specialty, the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians in that specialty; that the defendant either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred. La.R.S. 9:2794 A; White v. McCool, 395 So.2d 774 (La.1981); Tedeton v. Coffman, 544 So.2d 35 (La. App.2d Cir.1989). Expert testimony is essential in establishing the standard in a case of medical malpractice. Tedeton v. Coffman, supra; Steinberg v. Indemnity Ins. Co. of N. Amer., 364 F.2d 266 (5th Cir.1966).
The plaintiff need not show that the defendant's conduct was the only cause of her harm, nor must she negate all other possibilities; rather, she must show that more probably than not she suffered injuries because of the defendant's conduct. Straley v. Calongne Drayage & Storage Inc., 346 So.2d 171 (La.1977). In other words, the plaintiff's burden is not to prove her case beyond all doubt or even beyond a reasonable doubt, but merely by a preponderance of the evidence, or 51%; she need not negate all viable theories, but only show that her position is more probable than not. Howell v. Iacona, 505 So.2d 821 (La.App.2d Cir.1987).
A general physician or surgeon is required to exercise not the highest degree of care possible, but the degree of skill ordinarily employed by his professional peers under similar circumstances. Hunt v. Board of Supervisors of LSU, 522 So.2d 1144 (La.App.2d Cir.1988); Matthews v. Louisiana State Univ. Med. Center, 467 So.2d 1238 (La.App.2d Cir.1985).
When different medical procedures are involved, the defendant is liable not only for the original harm resulting from his substandard conduct, but for subsequent treatment that seeks to resolve the original harm. Weber v. Charity Hosp. of La., 475 So.2d 1047 (La.1985); Howell v. Iacona, supra.
Under the appropriate standard of review, we do not consider only so much of the evidence as will uphold or undermine the judgment, but rather the whole of the evidence with an eye to determining whether the judgment is plainly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Discussion: Conservative care
By her first assignment Mrs. Elliott urges the trial court erred in not finding that Dr. Robinson's failure to offer conservative treatment was a deviation from the applicable standard. The trial court found that Dr. Sandzén did not consider this aspect of Dr. Robinson's conduct substandard; he and other witnesses viewed the choice of treatment as a matter of professional judgment. Thus he concluded that that Dr. Robinson's decision was reasonable.
The evidence as to the standard of care is virtually uniform. Drs. Gaddis, Sandzén, Milstead and Bullock all testified that CTS should be treated conservatively unless severe symptoms are present, such as denervation shown by EMG, atrophy of muscles, or unbearable pain. Mrs. Elliott exhibited none of these symptoms in February 1984. Dr. McAlister described the same approach to treating CTS, phrasing it it in terms of a personal standard. Only Dr. Robinson set forth a standard of immediate surgery, which happens to conform with his conduct *1007 in the case. A passing mention of Dr. Robinson's "standard" was made by Dr. McAlister, who actually attributed it to "some people" who "go to immediate surgery." R. p. 420. On this evidence we find the standard of care was that announced by all the experts except Dr. Robinson. His conduct is a breach of the standard unless he can show a valid exception.
In his defense Dr. Robinson relies heavily on the special circumstances of Mrs. Elliott's case. She had CTS once before and used conservative treatment without success; it can be reasonably assumed that conservative treatment would fail again. In her job with the Postal Service she does precisely the type of manual tasks that cause and aggravate CTS; she is so dedicated to her work, and dependent on the income, that she would never have given it up as a part of conservative treatment; ergo surgery was the best course. However, her testimony does not prove that she would be totally opposed to therapy. She stated favorably that by using a splint before, "surgery was staved off for about five or six years," until the pain got bad. R. p. 591. As for the effect of her job on her CTS, it is the major factor and would have to be curtailed while the wrist was immobilized, but she managed to do this years before with Dr. Martin; she also did it with Dr. McAlister before the second surgery. Dr. Gaddis testified that if after conservative treatment she resumed her work and symptoms recurred, she would then be a candidate for surgery. R. p. 304. Dr. Sandzén did state that in acute cases of CTS immediate surgery could be appropriate, but this must be the patient's choice, always after complete disclosure of the risks and benefits of surgery. Sandzén Dep., 59, 22. He never stated that Dr. Robinson's choice to send Mrs. Elliott to immediate surgery was within the standard, and the trial court's finding to this effect is plainly wrong.
Neither Dr. Robinson nor Mrs. Elliott testified that they ever discussed the option of conservative treatment. On this record we simply cannot find adequate proof that Mrs. Elliott would have declined conservative treatment had it been offered. This is not a justification for sending her to immediate surgery.
The trial court finally held, citing Drs. Sandzén, McAlister and Milstead, that "no hard fast rule" requires conservative treatment before proceeding to surgery. This is inaccurate, based on the overwhelming weight of the evidence. Failure to offer conservative treatment in a case of CTS like Mrs. Elliott's is a deviation from the standard of care. The first assignment has merit.

Injury to the median nerve
By her second assignment Mrs. Elliott urges the trial court erred in not finding that Dr. Robinson breached the standard of care by injuring the motor and sensory branches of her median nerve in the February 1984 surgery. The evidence clearly shows that both branches were injured. According to the trial court's reasons, several experts opined that the neuroma on her palmar cutaneous branch could have been caused by laceration during surgery, but "most agreed" that scar tissue or other trauma not associated with the surgery could have caused the neuroma; Dr. Milstead testified there was no specific evidence the nerve had been cut. The court also found, based on the testimony of Drs. McAlister and Milstead, that scar tissue on the motor branch was a natural consequence of surgery and caused the weakness and pain in Mrs. Elliott's thumb.
The experts established that a neuroma is evidence of a cut nerve. The causal relationship appears strong and widely recognized. See, e.g., Muckleroy Dep., 13. Even Dr. Milstead directly linked injuries of the palmar cutaneous branch to the incisions made in carpal tunnel surgery. R. p. 647. In light of this testimony, it is somewhat perplexing for the trial court to say only that Mrs. Elliott's neuroma "could possibly have been caused" by surgical incision.
Other causes are recognized. After describing incision as the usual cause of neuromas, Dr. Milstead elaborated that he has seen a lot of people with "hypersensitive, *1008 tender palmar cutaneous nerves just from retraction and fibrous tissue reaction[.]" He then described different types of neuromas. Id. The type formed by retraction appears as swelling along the nerve and coming out of both ends. R. p. 648. Needless to say, this is not the type of neuroma that Dr. McAlister found in the second surgery, and there is no mention of retraction in Dr. Robinson's operative report or testimony that he retracted the nerve. Moreover, Dr. Sandzén testified it would take "tremendous trauma" to form a neuroma by stretching or pulling. Sandzén Dep., 66.
Another possible cause noted by the trial court was that scar tissue could have formed the neuroma. However, Dr. McAlister was clear that scarred adventitia, along with neuroma, are concurrent effects of trauma; he did not say that adventitia cause neuromas. R. p. 431. Given these facts, we must adopt Dr. McAlister's opinion that he could discern no other cause for this neuroma than that it was cut in Dr. Robinson's surgical procedure. R. p. 435.
We also find that Dr. Milstead's reliance on the pathology report is unpersuasive. He explained that this report would not mention nerve tissue unless a segment, cut on both ends and removed, was submitted for analysis. R. p. 685. The expert opinion was that Mrs. Elliott's palmar cutaneous branch was partially cut, not completely severed. The trial court was plainly wrong to find Dr. Robinson did not cut the palmar cutaneous branch of Mrs. Elliott's left median nerve. It was also error not to find he breached the standard of care.
As for the motor branch, Dr. McAlister's evidence is not quite as clear. His operative report states that "no definite neuroma" was present;[3] he testified that when Mrs. Elliott's motor branch went into the thenar eminence, it disappeared into a mass of scar tissue which he would not dissect lest he cut the nerve. R. p. 437. In fact, the experts were unanimous is stating that scar tissue is a natural consequence of surgical incision and can ultimately cause compression of the median nerve.
The problem with the trial court's finding that scarring led, by natural consequence, to the weakness and pain in Mrs. Elliott's thumb is the extent and speed of the scarring. She testified that by her third post-op office visit (February 23) she was losing the use of her thumb; Dr. Robinson noted this on March 5. On March 28, Dr. Brown's EMG showed abnormal readings in the base of her thumb, and he found atrophy. Dr. Gaddis viewed these facts as evidence of denervation of the motor branch. R. p. 285. Dr. McAlister found she could not oppose her thumb on May 7. Thus symptoms of denervation of the motor branch had begun to appear about three weeks after surgery and were serious by three months after it.
Dr. Gaddis testified that scar tissue takes six to eight weeks to grow thick enough to impinge the nerve; he did not think scarring caused Mrs. Elliott's symptoms. R. p. 287. Dr. Sandzén would not set a time frame, but stated it would take more than seven weeks. Sandzén Dep., 31. Dr. Muckleroy testified that scar tissue takes six months to produce the EMG readings that Mrs. Elliott had on March 28, not quite two months post-op. Muckleroy Dep., 9. Dr. Milstead felt that scarring caused these symptoms, but admitted he had never seen atrophy result from scarring within five weeks. R. p. 700. Dr. Bullock also testified that when he sat on the medical review panel he concluded that scarring was the culprit, but admitted he formed this conclusion in part because Dr. Brown reported opposition function on April 26; he was unaware that Dr. Brown only meant she could move her thumb over her palm. In sum, the overwhelming impact of the evidence is that normal surgical scarring takes much longer to compress the motor branch of the median nerve than it took for the symptoms of compression to appear in Mrs. Elliott's hand.
*1009 On this record we are constrained to find, in accordance with the opinions of Drs. Gaddis, Muckleroy and Sandzén, that Dr. Robinson more probably than not injured the palmar cutaneous and motor branches of Mrs. Elliott's left median nerve in the February 1984 surgery. We also find, in accordance with the opinions of these doctors and Dr. Bullock, that injuring her median nerve was a breach of the standard of care. The trial court's findings to the contrary are plainly wrong.

Damages
By her third assignment Mrs. Elliott urges the trial court erred in not finding that her causalgia and pain syndrome were caused by injuries to her median nerve in the February 1984 surgery. Although the court found that Dr. Robinson did not breach the standard of care, it also outlined reasons for dismissing Mrs. Elliott's complaints of pain. Certain of these facts are valid but they do not negate liability.
Mrs. Elliott testified that immediately after the surgery she had pain at the base of her left thumb and into her wrist; it felt like fire and was swollen. R. p. 556. She testified that she reported this to Dr. Robinson at the hospital, but his notes do not reflect it. Her first documented complaints of causalgia were to Dr. Boykin on March 26: discoloration and a feeling of coldness, requiring her to soak her hand in warm water two or three times a day. On April 26 Dr. Brown verified that she had mottled skin discoloration on the left wrist, with complaints of tenderness to pressure and percussion in the vicinity of the surgical scar. On May 7 Dr. McAlister linked this tenderness to a possible neuroma on the palmar cutaneous branch. R. p. 413. Under Dr. McAlister's care, her pain improved but was still present at the time of the second surgery in November. She testified that this operation relieved her symptoms, but she renewed her complaints when she saw Dr. Gaddis shortly before trial.
Dr. Gaddis identified causalgia as a constellation of symptoms and signs indicating a previous nerve injury with partial attempts at healing. The symptoms are pain in the area innervated by the nerve (sometimes beyond that area), swelling, temperature sensitivity, weakness and sometimes discoloration of the skin. R. p. 293. He felt that Mrs. Elliott's condition was part of a pain syndrome and was permanent. Dr. Brown also stated that causalgia results from the partial injury of a nerve. R. p. 381. He admitted that her pain syndrome could have contributed to the atrophy of her thenar eminence. R. p. 390. Dr. Milstead testified causalgia was an alteration of autonomic nerve function, resulting in pain and skin discoloration. R. p. 683. He agreed that cutting a nerve, in such a way as to form a neuroma, is normally seen with causalgia. R. p. 680.
This evidence shows, more probably than not, that Mrs. Elliott did indeed suffer from causalgia and pain syndrome, and that this condition resulted from a partial incision in her left median nerve during the February 1984 surgery. The trial court was plainly wrong to hold to the contrary. She is entitled to damages for her injury.
The court's discussion of Mrs. Elliott's pain syndrome, though gratuitous, sheds important light on the duration and severity of the injury. From her testimony and the corroboration of Drs. Boykin, Brown and McAlister it is clear that the pain was serious until late 1984. She testified that after the second surgery, she had some relief from her symptoms, and Dr. McAlister found she had reached "maximum benefit" in October 1985. After March 1986, she went four years without seeing a doctor for her thumb and wrist; when she finally did so, in March 1990, she did not describe symptoms of causalgia, but soreness which Dr. McAlister diagnosed as degenerative arthritis, unrelated to the February 1984 surgery. Arthritic changes certainly account for most of her current complaints. Thus we find that from late 1984 until sometime before March 1990 the pain was present, but manageable and not debilitating. In spite of her renewed complaints of causalgia symptoms to Dr. Gaddis in September 1991, the evidence does not show more probably than not that her recent *1010 pain is a result of the February 1984 surgery. Under the circumstances we cannot consider her causalgia and pain syndrome to be permanent, and damages will be fashioned accordingly. However, the 30% disability of her left thumb is permanent, according to Dr. McAlister.
Mrs. Elliott argues in brief that a case like Dupre v. Saenger Arts Center Inc., 508 So.2d 837 (La.App. 4th Cir.), writ denied 513 So.2d 1217 (1987), represents a low-range award for injuries like her own. In Dupre, general damages of $80,000 were affirmed for a plaintiff who sustained a 10% permanent disability to her right hand and 5% to her left, continuing sporadic stinging pains in her right hand, and permanent facial disfigurement. By contrast, Mrs. Elliott's disability is only in one thumb (not her entire hand) and she has no facial injury.
We find more guidance in the cases of Morgan v. Willis-Knighton Med. Center, 456 So.2d 650 (La.App.2d Cir.1984), and Wallace v. Slidell Memorial Hosp., 509 So.2d 69 (La.App. 1st Cir.1987). In Morgan an award of $50,000 was affirmed for a plaintiff whose ulnar nerve was injured in surgery, leaving him with decreased sensation in his fingers, muscle atrophy and causalgia; an expert assessed a 27% disability of the right arm, and 16% for the body as a whole. In Wallace an award of $30,000 was affirmed for a plaintiff with intermittent chronic pain, radial neurapraxia and paresthesia, and tingling in her fingers because a nerve was compressed. She was also found likely to develop traumatic arthritis.
Under the circumstances, an award of $40,000 for Mrs. Elliott's pain, suffering and permanent disability is appropriate and will be entered. Lost wages of $16,000 were stipulated at trial. R. p. 528. Medical expenses of $3,625.00 were documented. Ex. P-11. Judgment will be entered accordingly.

Decree
For the reasons expressed, the judgment rejecting Mrs. Elliott's claim for damages is reversed. Judgment is rendered as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, RETHA R. ELLIOTT, and against defendant, Dr. E.B. ROBINSON JR., in the full sum of Fifty-nine thousand, six hundred twenty-five and 00/100 ($59,625.00) dollars, together with legal interest thereon from date of judicial demand until paid.
All costs, trial and appellate, are assessed to the defendant.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.
NOTES
[1] This was the definition offered by every expert except Dr. Brown, who described "opposition" as merely moving the thumb across the palm. R. p. 384.
[2] The record does not state when she filed the claim but Dr. Robinson's first request for extension of time recites that the panel would expire on June 11, 1986. Medical review panels normally meet for 12 months, unless a decision is reached sooner or an extension is granted. La. R.S. 40:1299.47 B(1)(b).
[3] Elsewhere, when asked about "her neuroma," Dr. McAlister replied, "Whichwhich neuroma are you talking about, of the[?]" suggesting he suspected more neuromas than the one on the palmar cutaneous branch. R. p. 435.